WILLIAM F. TARANTINO (CA SBN 215343)
WTarantino@mofo.com
KWAN PARK (SBN 306719)
BPark@mofo.com
ROBERT SANDOVAL (SBN 311032)
RSandoval@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone: 415.268.7000
Facsimile: 415.268.7522

TRITIA M. MURATA (CA SBN 234344)
TMurata@mofo.com
MORRISON & FOERSTER LLP
707 Wilshire Boulevard, Suite 6000
Los Angeles, California  90017-3543
Telephone: 213.892.5200
Facsimile: 213.892.5454

Attorneys for Plaintiff
CALIFORNIA GROCERS ASSOCIATION

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA GROCERS ASSOCIATION, a California non-profit organization,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF OAKLAND, a charter municipality,<br><br>Defendant. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiff California Grocers Association ("Plaintiff" or "CGA") brings this action against Defendant City of Oakland ("Defendant" or "City") and alleges as follows in this Complaint for declaratory and injunctive relief:

## **INTRODUCTION**

1.      At the onset of the COVID-19 pandemic, the State of California and various counties, cities, and other regulatory bodies throughout the state issued a series of emergency orders and regulations in an effort to stem the spread of the virus and protect the public health and welfare. These early efforts—aimed at balancing the public's basic economic and social needs with a desire to minimize COVID morbidity and mortality—came at a steep price, especially for essential businesses, and the millions of employees and members of the public who rely on them.

2.      California grocers have stayed open to serve their communities since day one. They understand that defeating this pandemic requires extraordinary measures and have eagerly committed themselves to the task. Since March of 2020, California grocers of all sizes have established rigorous and science-driven safety measures, often at great expense, to adapt to this new environment and ensure that they operate in a safe and hygienic manner in order to help slow the spread of the virus, and protect their workers and the public.

3.      Grocers have implemented comprehensive safety measures for customers and employees and compensated frontline grocery employees for their extra efforts in a difficult environment.  Grocers have provided "appreciation pay," "hero bonuses," and "thank you pay" to reward their associates.  Additionally, in terms of employee support, grocers have offered COVID-19 testing to employees and provided emergency leave and paid time off to those affected by the virus or experiencing symptoms.

4.      For worker safety, grocers have provided supplies to employees including face masks and protective gear in addition to encouraging employees to stay home if feeling ill and implementing paid leave policies. Plexiglas shields, physical distancing measures, and contactless payment and delivery services have been implemented to protect employees.  Some of California's largest grocers such

2

sf-4422120

as Kroger and Albertsons joined the United Food and Commercial Workers International union just last year to urge federal and state governments to designate grocery store employees as emergency first responders.

5.     Yet on February 3, 2021, the City passed the "Grocery Worker Hazard Pay Emergency Ordinance" ("Ordinance") which requires employers to pay a $5 per hour premium on whatever the employees existing wage is at the time of enactment, regardless of any existing bonus, incentive, or hero pay program that the employer may have in place.

6.     The Ordinance unreasonably singles out specific grocers, while ignoring employers or essential frontline workers outside the grocery industry. Plaintiff seeks a declaration that the law is invalid and unconstitutional, and an injunction halting any action to enforce the Ordinance on the grounds that it (1) is preempted by federal law regulating collective bargaining and unfair labor practices; (2) violates the equal protection and contracts clauses of the U.S. and California constitutions.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over the subject matter of this suit pursuant to 28 U.S.C. §1331, as the Plaintiffs' claims arise under federal laws; namely, the National Labor Relations Act, 29 U.S.C. §141 *et seq.*; Article VI of the U.S. Constitution which designates the Constitution and Laws of the United States as the supreme law of the land; and the equal protection clause and contracts clause of the U.S. Constitution.

8.     This Court has supplemental jurisdiction over this subject matter pursuant to 28 U.S.C. §1367(a), as the Plaintiffs' claims arising under the California Constitution are so closely related to the federal question claims that they form part of the same case or controversy under Article III of the U.S. Constitution.

9.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b), as this Court is sited in the federal judicial district where the events giving rise to the

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
sf-4422120

1    CGA's claims have occurred, are now occurring, and will occur in the future if not
2    prevented through actions of this Court. CGA's members are situated in this district
3    and are and will continue to be adversely affected by the irreparable harms sought
4    to be remedied and prevented by this Court's action upon this Complaint.

5                                        **PARTIES**

6            10.    Plaintiff California Grocers Association has served as the voice of
7    the state's grocery community for over 120 years. As a nonprofit, statewide trade
8    association, CGA's membership is comprised of over 300 retailers and
9    approximately 150 grocery supply companies. As part of its mission, CGA has
10   advocated on behalf of its member retailers on important policy issues.
11   Headquartered in Sacramento, California, CGA brings this action on behalf of its
12   members operating stores in the City of Oakland.

13           11.    Defendant, City of Oakland, is and at all relevant times has been a
14   public entity duly organized and existing under and by virtue of the laws of the
15   State of California as a charter municipality.

16                            **FACTUAL BACKGROUND**

17           12.    California Grocers Association pursues this action on behalf of its
18   members who are grocery store employers ("Members") because the employers
19   who operate grocery stores in Oakland will suffer a direct and adverse impact from
20   the application of the Ordinance, and thus would have standing to pursue these
21   claims in their own right.  The policy and legal interest CGA seeks to protect is at
22   the core of Plaintiff's mission, and the injunctive and declaratory relief sought does
23   not require the participation of individual members.

24           13.    Several Members operate grocery stores in the City that employ
25   members of a specific labor union, United Commercial Food Workers International,
26   Local 5 ("UCFW 5"), and those employees are parties to collective bargaining
27   agreements that govern the terms of their employment, including wage scales.
28   Other Members operate grocery stores that do not employ unionized workers, but

4
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

those employees are free to organize and select a collective bargaining unit, should they choose to do so.

14. Members have suffered or will continue to suffer economic and non-economic harm as a result of the enactment of the Ordinance, and its foreseeable consequences on union organizing, ongoing collective bargaining, and labor relations for both unionized and non-union grocery stores in the City of Oakland. Members are required to alter the wage scales and other terms of their existing collective bargaining agreements, regardless of any additional hero pay, bonuses, or other non-monetary compensation provided to their employees to ease the burden of the COVID-19 pandemic.

15. By design, the Ordinance picks winners and losers.  It singles out large grocery companies with unionized workforces (i.e., UCFW 5's members) without providing any reasonable justification for the exclusion of other employers or frontline retail workers. The Ordinance arbitrarily and improperly targets certain grocery store businesses in Oakland for disparate treatment while not requiring the same commitments from similarly situated businesses, or conferring *any* benefits on similarly situated employees.  There is no support for any of the City's statements that the Premium Pay will protect public health, address economic insecurity, and promote job retention.

## THE ORDINANCE

16. The Grocery Worker Hazard Pay Emergency Ordinance codified in Chapter 5.96 in the Oakland Municipal Code is attached hereto as **Exhibit A**.  It applies only to grocery stores with over 15,000 square feet that sells primarily household foodstuffs for offsite consumption, and which are operated by companies with more than 500 employees.  Section 5.96.030.

17. Grocery stores meeting this minimum threshold of employees are required to provide each employee with premium pay consisting of an additional four dollars ($5.00) per hour for each hour worked.  Section 5.91.040.A  The

Ordinance requires hazard pay to paid until the Risk Level in the City of Oakland returns to Minimal (yellow) under State of California Health Orders. 5.96.040.C

18.    The Ordinance takes effect immediately and prohibits reducing a grocery employee's compensation or limiting a grocery employee's earning capacity for exercising any rights protected under the Ordinance. 5.96.070

19.    Grocery stores are required to provide a notice of rights established by the Ordinance.  Section 5.91.110.

### FIRST CAUSE OF ACTION

**Declaratory and Injunctive Relief**

**(NLRA Preemption)**

20.    CGA incorporates herein by this reference the allegations contained in Paragraphs 1 through 19, inclusive.

21.    Enacted in 1935, the National Labor Relations Act ("NLRA"), as amended, 29 U.S.C. § 151, *et seq*., creates a uniform federal body of law governing union organizing, collective bargaining, and labor-management relations applicable to employers engaged in interstate commerce.  It established various rules concerning collective bargaining and defined a series of banned unfair labor practices, including bans on interference with the formation or organization of labor unions by employers. The NLRA does not apply to certain workers, including supervisors, managerial employees and confidential employees – all categories specifically excluded from the Ordinance.

22.    The NLRA prohibits state and local regulation of conduct that Congress intended to be left to be controlled by the free-play of economic forces. Legislation that interferes with the "balanced state of collective bargaining" is preempted by the NLRA.  *See Machinists v. Wisconsin Employment Relations Comm'n*, 427 U.S. 132 (1976).

23.    In particular, the NLRA preempts any and all state and local enactments that, by design or consequence, regulate or interfere with the then-

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
sf-4422120

existing balance of economic power between labor and management with respect to zones of activity that, under federal labor law, are intended to be left to the free play of economic forces. Laws subject to NLRA preemption include laws that interfere with or attempt to regulate the economic tools available to labor or management during the course of collective bargaining or that otherwise interfere with the collective bargaining process, such as those that alter the parties' rights and economic alternatives during collective bargaining, or the processes and procedures utilized for union organizing.

24.    Application of the Ordinance to the activities of the Oakland Members unequivocally intrudes upon zones of activity in the areas of labor relations, union organizing, and collective bargaining that is reserved under federal labor law and policy to the free play of economic forces.  The Ordinance establishes premium pay standards that, by design or consequence, empower the UFCW or other collective bargaining units to secure a wage rate they could not otherwise have obtained from the employer at a unionized or non-union grocery store. This undermines the collective bargaining process and disrupts the process of union organizing.

25.    While the City has the ability to enact ordinances to further the health and safety of its citizens, the Ordinance here bears no relation to those goals. Local minimum wage laws, for example, seek to lessen the burden on public welfare services. This ordinance is not a minimum labor standard.  It is a mandatory hourly bonus for a specific group of workers, regardless of the wage negotiated in the current collective bargaining agreements or other employment agreements.

26.    The Ordinance is preempted by the NLRA as it regulates zones of activity that Congress intentionally left to be controlled by the free play of economic forces.

27.    The City's application and enforcement of the Ordinance will cause CGA's Members to suffer irreparable harm for which they have no adequate

remedy at law, even if the Ordinance is later declared by this Court to be void and unenforceable. This claim is also brought pursuant to 42 U.S.C. §1983 and §1988(b).

28.     CGA is entitled to judgment declaring the Ordinance to be void and unenforceable under the Supremacy Clause of the U.S. Constitution and equitable and injunctive relief to prevent the City of Oakland or any other private enforcer from attempting to enforce or give effect to the Ordinance.

## SECOND CAUSE OF ACTION

### Declaratory and Injunctive Relief

### (Equal Protection Clause of the United States Constitution)

29.     CGA incorporates herein by this reference the allegations contained in Paragraphs 1 through 28, inclusive.

30.     CGA hereby seeks declaratory, equitable and injunctive relief to prevent the City from depriving Plaintiff's members of the protections afforded to them under the Equal Protection Clause of the U.S. Constitution, which guarantee each and all of them equal protection of the laws.  (U.S. Const., Amend. XIV, § 1). This claim is also brought pursuant to 42 U.S.C. §1983 and §1988(b).

31.     The Equal Protection Clause requires that persons who are similarly situated receive like treatment under the law, and that statutes may single out a class for distinction only if that classification bears a rational relationship to the purpose of the statute.  As such, the City may not irrationally single out one class of individuals for discriminatory treatment.

32.     The Ordinance improperly singles out certain grocery store businesses in Oakland for disparate treatment while not requiring the same treatment of similarly situated businesses.  More importantly, the ordinance implicates the Members' fundamental right to be free from unreasonable governmental interference with their contracts, specifically their collective bargaining agreements and other employment agreements.

8

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

33.     The stated purpose of the Ordinance, namely, to protect public health, address economic insecurity, and promote job retention during the COVID-19 emergency by requiring grocery stores to provide premium pay is not rationally related to the discriminatory treatment of CGA's Members.  No significant and legitimate public purpose exists for the Ordinance.  The City's stated objectives are merely an attempt to impose a public policy rationale on interest-group driven legislation for labor unions and, in particular, for UFCW 5.

34.     By virtue of the foregoing, application of the Ordinance to the CGA's Members within the City violates the equal protection guarantees of the U.S. Constitution.

35.     The City's application and enforcement of the Ordinance will cause Plaintiff's members to suffer irreparable harm for which they have no adequate remedy at law, even if the Ordinance is later declared by this Court to be void and unenforceable.

## **THIRD CAUSE OF ACTION**

### **Declaratory and Injunctive Relief**

### **(Equal Protection Clause of the California Constitution)**

36.     CGA incorporates herein by this reference the allegations contained in Paragraphs 1 through 35, inclusive.

37.     CGA hereby seeks declaratory, equitable and injunctive relief to prevent the City from depriving CGA's members of the protections afforded to them under the Equal Protection Clause of the California Constitution, which like the U.S. Constitution, guarantees each and all of them equal protection of the laws. (Cal. Const., Art. I § 7.)

38.     For the same reasons set forth in Paragraphs 29 through 35 above, the Ordinance violates the Equal Protection Clause of the California.  Such application will cause CGA's Members to suffer irreparable harm for which they have no adequate remedy at law.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

sf-4422120

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FOURTH CAUSE OF ACTION**

**For Declaratory and Injunctive Relief**

**(Contracts Clause of the U.S. Constitution)**

39.     CGA incorporates herein by this reference the allegations contained in Paragraphs 1 through 38, inclusive.

40.     CGA hereby seeks declaratory, equitable and injunctive relief to prevent the City from depriving CGA's Members of the protections afforded to them under the Contracts Clause of the U.S. Constitution, which provides in pertinent part that: "No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ." (U.S. Const., Art. I, § 10, cl. 1).  The Contract Clause imposes limits upon the power of a State, and Municipalities operating under the color of State law, to abridge existing contractual relationships, even in the exercise of its otherwise legitimate police power.

41.     The Ordinance substantially interferes with Members' contracts, including its collective bargaining agreements with its employees, without any significant or legitimate public purpose. The City's stated objectives are to protect public health, address economic insecurity, and promote job retention.  None of these justifications support this measure, because the City's stated objectives are merely an attempt to impose a public policy rationale on interest-group driven legislation for labor unions and, in particular, for UFCW.

42.     Even if the City could show a significant and legitimate public purpose behind the regulation, the substantial impairment to the Members' contractual rights and obligations (i.e., the terms of the Members' existing collective bargaining agreements) are neither reasonable nor necessary to fulfill any such public purpose.

43.     By virtue of the foregoing, application of the Ordinance to CGA's members constitutes a substantial and unconstitutional impairment of those members existing contractual relationships that will cause them to suffer irreparable

10

sf-4422120

1  harm for which they have no adequate remedy at law.

2  ## FIFTH CAUSE OF ACTION

3  ### Declaratory and Injunctive Relief

4  ### (Contracts Clause of the California Constitution)

5  44.  CGA incorporate herein by this reference the allegations contained

6  in Paragraphs 1 through 43, inclusive.  Plaintiffs hereby seek declaratory and

7  injunctive relief to prevent the City from violating, and continuing to violate, the

8  Contract Clause of the California Constitution, which provides in pertinent part

9  that: "A ... law impairing the obligation of contracts may not be passed." (Cal.

10  Const., Art. I, § 9.)

11  45.  Like the Federal Contracts Clause, the California Contracts Clause

12  also imposes limits upon the State of California, and its municipalities, to abridge

13  existing contractual relationships, even in the exercise of its otherwise legitimate

14  police power.  For the same reasons set forth in Paragraphs 41 through 43 above,

15  application of the Ordinance to CGA's members within the City constitutes a

16  substantial and unconstitutional impairment of those members existing contractual

17  relationship in violation of the California Contract Clause. Such application will

18  cause those members to suffer irreparable harm for which they have no adequate

19  remedy at law.

20  ## PRAYER FOR RELIEF

21  WHEREFORE, Plaintiff prays for the following relief:

22  1.  On the first cause of action, a judgment declaring that the

23  Ordinance, as well as any act taken in furtherance of the Ordinance by any person,

24  is preempted by the National Labor Relations Act, and its implementing regulations

25  and guidance, and are therefore void and unenforceable, and entering a preliminary

26  and permanent injunction enjoining the City from enforcing or taking any action

27  under the Ordinance;

28

2.    On the second and third causes of action, enter a judgment declaring that the Ordinance, as well as any act taken in furtherance of the Ordinance by any person, violate state and federal equal protection guarantees, and are therefore void and invalid, and entering a preliminary and permanent injunction enjoining the City from enforcing or taking any action under the Ordinance;

3.    On the fourth and fifth causes of action, enter a judgment declaring that the Ordinance, as well as any act taken in furtherance of the Ordinance by any person, violate the contracts clauses of the state and federal constitution, and are therefore void and invalid, and entering a preliminary and permanent injunction enjoining the City from enforcing or taking any action under the Ordinance;

4.    For an award of attorneys' fees and costs of suit herein pursuant to California Code of Civil Procedure § 1021.5, 42 U.S.C. §1988, or any other applicable law; and

5.    For such other and further relief as the Court may deem just and proper.

Dated:    February 3, 2021          MORRISON & FOERSTER LLP


By:   */s/ William F. Tarantino*
      William F. Tarantino

      Attorneys for Plaintiff
      CALIFORNIA GROCERS
      ASSOCIATION

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

sf-4422120

# Exhibit A

APPROVED AS TO FORM AND LEGALITY

INTRODUCED BY COUNCIL PRESIDENT BAS AND
COUNCIL MEMBER GALLO

DRAFT

_____
CITY ATTORNEY'S OFFICE

# OAKLAND CITY COUNCIL

## ORDINANCE NO. _____C.M.S.

**EMERGENCY ORDINANCE (1) ADDING CHAPTER 5.96 TO THE OAKLAND MUNICIPAL CODE TO REQUIRE LARGE GROCERY STORES IN OAKLAND TO PAY EMPLOYEES AN ADDITIONAL FIVE DOLLARS ($5.00) PER HOUR IN HAZARD PAY DURING THE NOVEL CORONAVIRUS (COVID-19) PANDEMIC AND (2) AMENDING CHAPTER 2.44 OF THE OAKLAND MUNICIPAL CODE TO INCLUDE ENFORCEMENT OF EMERGENCY HAZARD PAY TO GROCERY EMPLOYEES AS PART OF THE DUTIES OF THE DEPARTMENT OF WORKPLACE AND EMPLOYMENT STANDARDS**

**WHEREAS**, on March 19, 2020, the California State Public Health Officer, designated specific sectors and their workers, including grocery stores, as Essential Critical Infrastructure Workers ("essential workers") to ensure the "continuity of functions critical to public health and safety, as well as economic and national security;" and

**WHEREAS**, since the beginning of the COVID-19 pandemic, grocery workers in the City of Oakland have continued to report to work and serve their communities, despite the ongoing hazards and danger of being exposed to and infected by the novel coronavirus, helping to ensure individuals throughout the City of Oakland have had access to the food they need during this pandemic; and

**WHEREAS,** grocery workers are not highly paid, and according to an August 2020 article in *The Washington Post*, at least 130 U.S. grocery workers have died from COVID-19, and more than 8,200 have tested positive for the virus; and

**WHEREAS**, essential grocery workers cannot choose to work from home--they must come to work to do their jobs, which involve heightened risk of exposure and infection of COVID-19 through substantial interaction with customers on an ongoing basis and indoors where there is less air circulation; and

**WHEREAS**, despite the efforts of grocery stores to take precautions and keep customers and employees safe, including requiring masks, social distancing, and sanitizing cash registers, food conveyor belts, and shopping carts, there have been highly publicized outbreaks of COVID-

1

19 among grocery store employees in the City of Oakland, and the health threats that these grocery workers face cannot be overstated; and

**WHEREAS**, Latinos comprise about 40% of California's population but 54.9% of positive cases, according to state data as of January 20, 2021, and according to health experts, one of the main reasons Latinos are especially vulnerable to COVID-19 is because many work in jobs deemed "essential," that require them to leave home and interact with the public, many in the retail food industry, which includes grocery stores; and

**WHEREAS**, United Food and Commercial Workers ("UFCW") Locals in Northern California, which represent grocery workers, report that over 700 grocery workers in their ranks have tested positive with COVID-19, and members of their union have been hospitalized or have died from the coronavirus; and

**WHEREAS**, we are now in the height of the pandemic with a stay at home order in many regions of the state, including the Bay Area region, where ICU capacity is below fifteen (15) percent, and we are a long way from minimal risk where there would be one (1) daily new case per 100,000 or less than two (2) percent positivity; and

**WHEREAS**, the City of Oakland recognizes that essential grocery workers must be justly compensated for the clear and present dangers of doing their jobs during the pandemic, and increases in wages result in more money being spent to stimulate our local economy; and

**WHEREAS**, the United States' top grocery retail companies have earned record-breaking profits during the pandemic, and this increase in profit has not transferred to workers, according to a Brookings Institution analysis published in November 2020; and

**WHEREAS**, the City of Oakland has recently adopted ordinances to address COVID-19-related protections for workers, including Emergency Paid Sick Leave; and

**WHEREAS**, the City of Oakland has adopted wage and employment ordinances specific to employment sectors in the past; and

**WHEREAS**, there are numerous large grocery chains operating in Oakland that employ workers in Oakland, and have at least 500 employees nationwide, with workers who are facing the hazards of COVID-19 in the workplace every day; and

**WHEREAS**, on January 17, 2021, the California Department of Public Health reported another COVID-19 variant that had grown more common across the state since December, with worrisome signs that this variant may be highly transmissible; and

**WHEREAS**, in December 2020 and January 2021, a growing list of cities across California, including Berkeley, Los Angeles, Long Beach, San Jose, and San Leandro began announcing legislation for hazard pay for essential grocery workers during the period where counties are in the Purple, Red, or Orange level of Community Transmission for COVID-19 under State Health orders; and

2

**NOW, THEREFORE, THE CITY COUNCIL OF THE CITY OF OAKLAND DOES ORDAIN AS FOLLOWS:**

**SECTION 1. Recitals.** The City Council finds the foregoing recitals to be true and correct and hereby incorporates those recitals into this Ordinance.

**SECTION 2. Emergency Need.** In accordance with Section 213 of the Oakland City Charter, the City Council finds and declares that adoption of this Emergency Ordinance is necessary for preserving the public peace, health and safety for the following reasons:

A. The COVID-19 pandemic has led to the current state of emergency in California.

B. Governor Newsom issued the "Safer at Home" emergency order on December 3, 2020 as a result of the critically low availability Intensive Care Unit ("ICU") beds. The City of Oakland is currently operating at maximum capacity in its ICUs.

C. The virus is spreading rapidly across the region with many clusters arising within retail stores. Grocery stores remain a critical piece of infrastructure in our fight against the COVID-19 virus and in protecting the food supply chain.

D. Grocery stores are the primary points of distribution for food and other daily necessities for the residents of the City of Oakland and are therefore essential to the vitality of our community.

E. Turnover, inability to pay for housing and increased childcare costs as a result of school closures and other necessities could become an immediate problem for certain grocery workers if they are not given relief.

F. To protect the food supply chain and the public health and safety, the City of Oakland must take steps to guard against turnover and ensure that large grocery stores in Oakland have well-trained, consistent and stable staffing.

**SECTION 3. Effective Date.** This Ordinance shall take effect immediately if adopted in accordance with Section 216 of the Oakland City Charter.

**SECTION 4. Emergency Grocery Worker Hazard Pay Sunset.** Section 5 of this Ordinance shall remain in effect during any period the City of Oakland is within a Widespread (purple), Substantial (red) or Moderate (orange) Risk Level and shall become ineffective during any period when the Risk Level in the City of Oakland returns to Minimal (yellow) under State of California Health Orders.

**SECTION 5.  Emergency Grocery Worker Hazard Pay.**  A new Chapter 5.96 is added to the Oakland Municipal Code as follows:

**5.96.010. Title.**

This Chapter shall be known as the "Grocery Worker Hazard Pay Emergency Ordinance."

**5.96.020 – Authority.**

This Chapter is adopted pursuant to the powers vested in the City of Oakland under the laws of the State of California, including, but not limited to, the police powers vested in the City pursuant to Article XI, Section 7 of the California Constitution, California Labor Code section 1205 (b), and the Charter of the City of Oakland.

**5.96.030. Definitions.**

The definitions set forth in this Section shall govern the construction and meaning of the terms used in this Chapter:

A.  "Base Wage" means the hourly wage paid to Covered Employees as of the effective date of this Chapter less Hazard Pay owed under this Ordinance or any other premium hourly rate already paid to compensate Covered Employees for working during the pandemic (referred to herein as "employer-initiated hazard pay").

B.  **"**City" means the City of Oakland.

C.  "Covered Employee" means any individual who qualifies as an employee entitled to payment of a minimum wage from any employer under the California minimum wage law, as provided under Section 1197 of the California Labor Code and wage orders published by the California Industrial Welfare Commission, and who works in a Large Grocery Store on either a full-time or part-time basis.

D.  "Covered Employer" means any Person who (a) directly or indirectly or through an agent or any other Person owns or operates a Large Grocery Store and employs or exercises control over the wages, hours or working conditions of any Covered Employee; and (b) employs 500 or more employees nationwide regardless of where those employees are employed, or is a Franchisee associated with a Franchisor or a network of Franchises with Franchisees that employ more than 500 employees in the aggregate, regardless of where those employees are employed.  To determine the number of employees employed by a Large Grocery Store, the calculation shall be based upon:

a.  The actual number of employees who worked for compensation during the two workweeks preceding the effective date of this Chapter; and

4

    b.  All employees who worked for compensation shall be counted, including but not limited to:

        i.  Employees who are not covered by this Chapter;

        ii.  Employees who worked within the geographic limits of the City;

        iii.  Employees who worked outside the geographic limits of the City; and

        iv.  Employees who worked in full-time employment, part-time employment, joint employment, temporary employment, or through the services of a temporary services or staffing agency or similar entity.

E.  "Employer-Initiated Hazard Pay" means a premium hourly rate to compensate Covered Employees for the hardships and/or risks associated with working during the COVID-19 pandemic.  If a Covered Employer pays such Employer–Initiated Hazard pay on a flat rate basis, the premium hourly rate is derived by dividing the flat rate payment for a workweek by the number of hours worked in the workweek.

F.  "Franchise" means a written agreement by which:

    1.  A Person is granted the right to engage in the business of offering, selling, or distributing goods or services under a marketing plan prescribed or suggested in substantial part by the grantor or its affiliates; and

    2.  The operation of the business is substantially associated with a trademark, service mark, tradename, advertising, or other commercial symbol; designating, owned by, or licensed by the grantor or its affiliate; and

    3.  The Person pays, agrees to pay, or is required to pay, directly or indirectly, a Franchise fee.

G.  "Franchisee" means a Person to whom a Franchise is offered or granted.

H.  "Franchisor" means a Person who grants a franchise to another Person.

I.  "Hazard Pay" means an additional $5.00 per hour wage bonus in addition to each Covered Employee's Base Wage or Holiday Premium wage for each hour worked within the City.

J.  "Holiday Premium" means the hourly wage paid to Covered Employees for performing work during a holiday or holiday season.

K. "Hours Worked" means the time during which a Covered Employee is subject to the control of a Covered Employer, including all the time the employee is suffered or permitted to work, and on-call.

L. "Large Grocery Store" means a retail or wholesale store that is over 15,000 square feet in size, that is located within the geographic limits of the City, and that sells primarily household foodstuffs for offsite consumption, including the sale of fresh produce, meats, poultry, fish, deli products, dairy products, canned foods, dry foods, beverages, baked foods, or prepared foods. Other household supplies or other products shall be secondary to the primary purpose of food sales.

M. "Person" means any individual, corporation, partnership, limited partnership, limited liability partnership, limited liability company, business trust, estate, trust, association, joint venture, agency, instrumentality, or any other legal or commercial entity, whether domestic or foreign.

N. "Retaliatory Action" shall have the same meaning as "Retaliation" as defined in Section 5.92.050 of the Oakland Municipal Code.

## 5.96.040. Payment of Hazard Pay to Covered Employees.

A. Hazard Pay. Covered Employers shall pay Covered Employees a wage of no less than the premium hourly rate set under the authority of this Chapter. The premium hourly rate for each Covered Employee shall be an additional five dollars ($5.00) per hour for all hours worked at a Large Grocery Store on top of the Covered Employee's Base Wage or Holiday Premium, whichever applicable at the time of hours worked. The Hazard Pay rate shall not include compensation already owed to Covered Employees, Holiday Premium rates, gratuities, service charge distributions, or other bonuses.

B. Credits. Covered Employers providing employer-initiated hazard pay will be credited for doing so in accordance with Section 5.96.050.

C. Duration of Hazard Pay. Covered Employers shall pay Hazard Pay to all Covered Employees for any pay period during which the City of Oakland is within a Widespread (purple), Substantial (red) or Moderate (orange) Risk Level, and until such time as Risk Levels return to Minimal (yellow) under State Health Orders.

## 5.96.050. Credit for Employer–Initiated Hazard Pay.

A. Employer-Initiated Hazard Pay shall be credited against the five dollars ($5.00) per hour for the hourly amount paid to each Covered Employee (e.g., A Covered Employer offering two dollars ($2.00) per hour in Employer-Initiated Hazard Pay owes an additional three dollars ($3.00) per hour in Hazard Pay per this Chapter.) To receive credit for paying a Covered Employee Employer–Initiated Hazard Pay, a Covered Employer must demonstrate that, as of the effective date of this Chapter and in any subsequent covered workweeks, the Covered Employer paid such Employer-

Initiated Hazard Pay to the Covered Employee.  No Covered Employer shall be credited prospectively for any past payments. No Covered Employer shall be credited for any hourly premiums already owed to Covered Employees, such as but not limited to, Holiday Premiums. Nothing herein shall be interpreted to prohibit any employer from paying more than five dollars ($5.00) per hour in Hazard Pay.

B. Covered Employers must, upon request, immediately provide the following to the Department of Workplace and Employment Standards to receive credit for Employer-Initiated Hazard Pay:

   1. A copy of the Employer's Hazard Pay policy; and

   2. A statement, provided under penalty of perjury, explaining Covered Employees' hourly Base Wages, hourly Holiday Premiums, hourly employer-initiated hazard pay, and any other wage bonuses received during the last twelve (12) all months; and

   3. For any Covered Employee(s) as to whom a Covered Employer seeks credit for Employer–Initiated Hazard Pay, documentation reflecting that such payments were made, for each hour claimed; and

   4. Documentation that allows the City to review for compliance by assessing wages for the past twelve (12) months and that is itemized in such a way that the City can understand a Covered Employee's Base Wage distinguished from Holiday Premiums and other bonuses or pay increases that are separate and distinct from employer-initiated hazard pay.

      a. The following constitutes acceptable evidence of employer-initiated hazard pay described in Subsection (B)(4): A spreadsheet, of all Covered Employees and their wages for each pay period for the last twelve (12) months, that allows the City to distinguish Base Wage from Holiday Pay and other bonuses or pay increases that are separate and distinct from employer-initiated hazard pay.

      b.  Production of the evidence described in Subsection (B)(4)(a) does not exempt any Covered Employer from maintaining, and providing access to, the underlying payroll records described in this Section and in Oakland Municipal Code Section 5.92.050(C).

C. Any offer of proof under subsection shall be accompanied by a written acknowledgment that it was submitted under penalty of perjury.

**5.96.060.  Waiver**

The provisions of this chapter may not be waived by agreement between an individual Covered Employee and a Covered Employer.  All the provisions of this Chapter, or any part thereof, may be waived in a bona fide collective bargaining agreement, but only if the waiver is explicitly set forth in such agreement in clear and unambiguous terms.

**5.96.070.  Prohibitions.**

It shall be unlawful for a Covered Employer or any other Person to interfere with, restrain or deny the existence of, or the attempt to exercise, any rights protected under this Chapter.

    A.   Employers shall not take Retaliatory Action or discriminate against any employee or former employee because the individual has exercised rights protected under this Chapter.  Such rights include, but are not limited to, the right to request Hazard Pay pursuant to this Chapter; the right to file a complaint with the City or inform any person about an employer's alleged violation of this Chapter; the right to participate in an investigation, hearing or proceeding or cooperate with or assist the City in its investigations of alleged violations of this Chapter, and the right to inform any person of their rights under this Chapter.  Protections of this Chapter shall apply to any employee who mistakenly, but in good faith, alleges noncompliance with this Chapter.  Taking adverse action against an employee, including lowering an employee's Base Wage or Holiday Premium Wages or reducing work hours, within 90 days of the employee's exercise of rights protected under this Chapter shall raise a rebuttable presumption of having done so in retaliation for the exercise of such rights.

**5.96.080.  Enforcement**

The provisions related to enforcement set forth in the Oakland Municipal Code Section 5.92.050 (A), (C), and (E)-(K) shall apply equally to the enforcement of this Chapter and individuals and entities afforded rights and protections under those Sections are hereby granted those same rights and protections in connection with the enforcement of any provision of this Chapter. Covered Employers shall have all obligations of "Employers" and "employers" under Section 5.92.050. The terms "Employer," "Employ," and "Employee," when used in Section 5.92.050 for purposes of enforcing provisions of this Chapter, shall have the meanings set forth in Section 5.94.020 of this Chapter. The provisions of this Chapter do not diminish, alter, or negate any other legal rights, remedies, or procedures available to an Employee.

**5.96.090. Regulations.**

The Department of Workplace and Employment Standards may promulgate and enforce rules and regulations, and issue determinations and interpretations, consistent with and necessary for the implementation of this Chapter.  Such rules and regulations, determinations, and interpretations shall have the force of law and may be relied upon by employers, employees, and other persons to determine their rights and responsibilities under this Chapter.

**5.96.100.  Conflict.**

Nothing in this article shall be interpreted or applied to create any power or duty in conflict with any federal or state law.  The term "Conflict," means a conflict that is preemptive under federal or state law.

**5.96.110. Notice.**

A.  The City shall, as expeditiously as possible, publish and make available on its website a notice suitable for Covered Employers to inform employees of their rights under this emergency Chapter.  Such notice shall be translated into Spanish, Chinese, and Vietnamese.

B.  Every Covered Employer shall, within three days after the City has published and made available the notice described in Subsection A of this Section, provide the notice to employees in a manner calculated to reach all employees, including, but not limited to, posting in a conspicuous place at the workplace; via electronic communication; or posting in a conspicuous place in a Covered Employer's web–based or app–based platform.  The Covered Employer's notification shall be provided in all languages spoken by more than ten percent (10%) of Employees.

C.  Every Covered Employer shall, within three days after the City has published and made available the notice described in Subsection A of this Section or at the time of hire, whichever is later, provide each Covered Employee the Covered Employer and owner or manager's name; address; telephone number; and whether it is part of a franchise associated with a franchisor or network of franchises.  If the information the Covered Employer provided to the Covered Employee changes, the Covered Employer shall provide the updated information in writing within ten days of the change.

D.  Every Covered Employer shall provide notice to employees when the Risk Level in the City either moves from Widespread (purple), Substantial (red) or Moderate (orange) to Minimal (yellow), or from Minimal (yellow) to Widespread (purple), Substantial (red) or Moderate (orange) under a State of California Health Order.  Notice shall be given in a manner calculated to reach all employees, including, but not limited to, posting in a conspicuous place at the workplace; via electronic communication; or posting in a conspicuous place in a Covered Employer's web–based or app–based platform.  The Covered Employer's notification shall be provided in all languages spoken by more than ten percent (10%) of Employees

**5.96.120.  No Preemption of Higher Standards.**

The purpose of this Chapter is to ensure minimum labor standards.  This Chapter does not preempt or prevent the establishment of superior employment standards (including higher wages) or the expansion of coverage by ordinance, resolution, contract, or any other action of the City.

**5.96.130.  Severability.**

If any subsection, sentence, clause or phrase of this Chapter is for any reason held to be invalid or unconstitutional by a court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of this Chapter, which shall remain in full force and effect.  The City Council hereby declares that it would have passed this Chapter and each and every subsection, sentence, clause and phrase thereof not declared invalid or unconstitutional, without regard to whether any portion of the article would be subsequently declared invalid or unconstitutional. The courts are hereby authorized to reform the provisions of this Chapter in order to preserve the maximum permissible effect of each subsection herein.

  **SECTION 6**.  Oakland Municipal Code Chapter 2.44, which established the Department of Workplace and Employment Standards, is hereby amended to modify sections as set forth below; additions are indicated by underscoring and deletions are indicated by strike-through type; portions of the Chapter not cited or not shown in underscoring or strike–through type are not changed:

**2.44.010.  Department of Workplace and Employment Standards**

There is hereby created under the jurisdiction of the City Administrator a Department of Workplace and Employment Standards.  Effective July 1, 2020, the Department of Workplace and Employment Standards shall enforce Chapter 2.28 ("Living Wage Ordinance"); Chapter 2.36 ("Worker Retention at Large–Scale Hospitality Business Ordinance"); Chapter 5.92 ("City Minimum Wage, Sick Leave, and Other Employment Standards"); Chapter 5.93 ("Hotel Minimum Wage and Working Conditions"); Prevailing Wage Resolution (Resolution No.  57103 C.M.S.), Local Employment Program (Part IV of the Local and Small Business Enterprise Program, Resolution No. 69687 C.M.S., as amended and codified by Ordinance No.  12389 C.M.S.,  and as subsequently amended), Fifteen (15) Percent Apprenticeship Program (Resolution No. 74762 C.M.S.),  Chapter 5.94 ("Protecting Workers and Communities During the Pandemic – COVID–19 Emergency Paid Sick Leave Ordinance"), Chapter 5.95 ("Hospitality and Travel Worker Right to Recall"), and Chapter 5.96 ("Grocery Worker Hazard Pay Emergency Ordinance"), and shall carry out such additional duties and functions as assigned by the City Administrator, or by Charter, ordinance, or City Council resolution.  The Department of Workplace and Employment Standards may impose penalties and take any and all appropriate action to enforce the requirements of such provisions.  The Department of Workplace and Employment Standards shall have authority to adopt rules and regulations consistent with and necessary for the implementation of the foregoing laws.  Such rules and regulations shall have

the force and effect of law, and may be relied upon by employers, employees and other persons to determine their rights and responsibilities.  The Department of Workplace and Employment Standards may enforce the provisions of the California labor Code to the extent permitted by State law.

IN COUNCIL, OAKLAND, CALIFORNIA,

PASSED BY THE FOLLOWING VOTE:

AYES – FIFE, GALLO, KALB, KAPLAN, REID, TAYLOR, THAO AND
          PRESIDENT FORTUNATO BAS

NOES –
ABSENT –
ABSTENTION –

ATTEST:_____

ASHA REED
Acting City Clerk and Clerk of the
Council of the City of Oakland, California


Date of Attestation: _____

11

**NOTICE AND DIGEST**

**EMERGENCY ORDINANCE (1) ADDING CHAPTER 5.96 TO THE OAKLAND MUNICIPAL CODE TO REQUIRE LARGE GROCERY STORES IN OAKLAND TO PAY EMPLOYEES AN ADDITIONAL FIVE DOLLARS ($5.00) PER HOUR IN HAZARD PAY DURING THE NOVEL CORONAVIRUS (COVID-19) PANDEMIC AND (2) AMENDING CHAPTER 2.44 OF THE OAKLAND MUNICIPAL CODE TO INCLUDE ENFORCEMENT OF EMERGENCY HAZARD PAY TO GROCERY EMPLOYEES AS PART OF THE DUTIES OF THE DEPARTMENT OF WORKPLACE AND EMPLOYMENT STANDARDS**

This Emergency Ordinance adds Chapter 5.96 to the Oakland Municipal Code to establish emergency hazard pay for grocery workers during the Coronavirus (COVID–19) pandemic and amends Chapter 2.44 of the Oakland Municipal Code to include enforcement of the Grocery Worker Hazard Pay Emergency Ordinance as part of the duties of the Department of Workplace and Employment Standards.

This Emergency Ordinance is necessary for preserving the public peace, health, or safety during the COVID–19 health emergency. Pursuant to section 213 of the City Charter, upon final adoption on first reading this Ordinance will become effective immediately if it receives six or more affirmative votes.