1    BARBARA J. PARKER, City Attorney, SBN 069722
     MARIA BEE, Chief Assistant City Attorney, SBN 167716
2    SELIA M. WARREN, Deputy City Attorney, SBN  233877
     RAJIV R. NARAYAN, Attorney, SBN  334511
3    One Frank H. Ogawa Plaza, 6th Floor
     Oakland, California 94612
4    Telephone: (510) 238-6524; Fax: (510) 238-6500
     Email: swarren@oaklandcityattorney.org
5    X05239/3038058

6    Attorneys for Defendant,
     CITY OF OAKLAND

7

8

9                   UNITED STATES DISTRICT COURT

10                NORTHERN DISTRICT OF CALIFORNIA

11                   SAN FRANCISCO  DIVISION

12

13   CALIFORNIA GROCERS ASSOCIATION,          Case No. 3:21-cv-00863-WHO
     a California non-profit organization
14                                            **DEFENDANT CITY OF OAKLAND'S**
                     Plaintiff,               **MOTION TO DISMISS AND MOTION**
15                                            **TO DISMISS PLAINTIFF'S**
     v.                                       **COMPLAINT; MEMORANDUM OF**
16                                            **POINTS AND AUTHORITIES IN**
     CITY OF OAKLAND, a charter municipality  **SUPPORT THEREOF**
17
                     Defendant.               **[Fed. R. Civ. P. 12(b)]**
18
                                              Date:     May 12, 2021
19                                            Time:     2:00 p.m.
                                              Dept.:    Courtroom 2, 17th Floor
20                                            450 Golden Gate Ave, San Francisco CA
                                              94102
21
                                              The Honorable Judge William H. Orrick
22

23

24

25

26

27

28

**NOTICE OF MOTION**

TO ALL PARTIES AND ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on Wednesday May 12, 2021, at 2:00 p.m., or as soon thereafter as the Court may schedule hearing, the City of Oakland (the "City") will and hereby does move the Court to dismiss the Complaint in this action pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). Plaintiff California Grocers Association ("CGA") lacks standing to challenge City Ordinance No. 13639 C.M.S. (the "Ordinance") because it fails to identify at least one member that has suffered or would suffer harm as a result of the Ordinance. CGA's Complaint also fails to state a claim for relief because (1) the Ordinance is a substantive labor standard; it does not interfere with the collective bargaining process and is thus not preempted under the *Machinists* doctrine; (2) the Ordinance does not violate the Equal Protection Clause of the United States Constitution or California Constitution because it does not implicate any fundamental right and readily passes rational-basis review; and (3) the Ordinance does not violate the Contracts Clause of the United States Constitution or California Constitution because it does not substantially impair any collective bargaining agreement of any CGA member–indeed, none are identified–and, in any case, it has a legitimate and significant public purpose.

The Motion is based upon this Notice, the accompanying Memorandum of Points and Authorities, the concurrently filed Request for Judicial Notice, the complete files and records of this proceeding, and such further briefing and argument as the Court may allow.

Dated:  April 5, 2021                      BARBARA J. PARKER, City Attorney


By:  /s/ Selia M. Warren
Attorneys for Defendant
CITY OF OAKLAND

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................................1

II.     STATEMENT OF ISSUES ........................................................................................3

III.    STATEMENT OF FACTS .........................................................................................3

        A.      Grocery workers, essential to society, have been hit hard by the COVID-19 pandemic. .......................................................................................................3

        B.      The City adopts an emergency ordinance to support grocery workers. ..............5

        C.      CGA sues the City and several other localities. ................................................6

IV.     LEGAL STANDARD ...............................................................................................7

V.      ARGUMENT .............................................................................................................8

        A.      CGA lacks standing to bring this claim because it fails to identify at least one member that has suffered or would suffer harm as a result of the Ordinance. ..........................................................................................................9

        B.      The National Labor Relations Act does not preempt the Ordinance. ................10

                1.      *Machinists* preempts state laws that regulate the collective bargaining process; it does not preempt laws that merely set substantive employment standards. ...........................................................11

                2.      To the extent CGA relies on *Chamber of Com. of U.S. v. Bragdon*, 64 F.3d 497 (9th Cir. 1995) it is factually distinguishable and has been effectively repudiated by the Ninth Circuit. ....................................14

                3.      The Ordinance is a substantive labor standard; it does not interfere with the collective bargaining process, and it contains an opt-out provision for collective bargaining. ...............................................................15

                4.      The Ordinance is the kind of legislation courts have found to be a valid exercise of police power permissible by the NLRA. .......................17

        C.      The Ordinance does not violate the U.S. or California Equal Protection Clauses. ...........................................................................................................18

                1.      Freedom of contract is not a fundamental right for purpose of equal protection analysis and rational basis review applies to the Ordinance. ................................................................................................19

                2.      The Ordinance easily satisfies rational basis review. ..............................20

        D.      The Ordinance does not violate the U.S. or California Contracts Clauses. ...........21

                1.      The CGA fails to meet the threshold requirements of a Contracts Clause claim. ...........................................................................................22

                2.      The Ordinance is justified by a significant and legitimate purpose. ..........23

                3.      The Ordinance also sets reasonable conditions that are appropriate to the policy's purpose. ............................................................................24

VI.     CONCLUSION.........................................................................................................25

**TABLE OF AUTHORITIES**

**Cases**

*Alaska Airlines Inc. v. Schurke*,
   898 F.3d 904 (9th Cir. 2018), *cert. denied*, 130 S.Ct. 1445 (2019)..........................................18

*Allied Structural Steel Co. v. Spannaus*,
   438 U.S. 234 (1978)..................................................................................................................22

*Am. Hotel & Lodging Ass'n v. City of Los Angeles*,
   834 F.3d 958 (9th Cir. 2016) ...................................................................................12, 14, 17, 18

*Ass'n of Surrogates & Supreme Court Reporters Within City of N.Y. v. State of N.Y.*,
   940 F.2d 766, 771 (2d Cir. 1991) .............................................................................................25

*Associated Builders & Contractors of S. California, Inc. v. Nunn*,
   356 F.3d 979 (9th Cir. 2004), *amended,* No. 02-56735, 2004 WL 292128 (9th Cir. Feb. 17,
   2004)...........................................................................................................................15, 17, 18

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)....................................................................................................................8

*Bldg. & Const. Trades Council of Metro. Dist. v. Associated Builders & Contractors of
   Massachusetts/Rhode Island, Inc.*,
   507 U.S. 218 (1993)...................................................................................................................11

*Calfarm Ins. Co. v. Deukmejian*,
   48 Cal. 3d 805 (1989)................................................................................................................22

*California Grocers Ass'n v. City of Daly City*,
   No. 21-cv-01773 (N.D. Cal. Mar. 12, 2021) ...............................................................................7

*California Grocers Ass'n v. City of Long Beach*,
   No. 21-cv-00524 (C.D. Cal. Jan 20, 2021)..................................................................................7

*California Grocers Ass'n v. City of Montebello*,
   No. 21-cv-01011 (C.D. Cal. Feb 03, 2021) .................................................................................7

*California Grocers Ass'n v. City of San Jose*,
   No. 21-cv-01772 (N.D. Cal. Mar. 12, 2021) ...............................................................................7

*California Grocers Ass'n v. City of San Leandro*,
   No. 21-cv-01175 (N.D. Cal. Feb 17, 2021) .................................................................................7

*California Grocers Ass'n v. City of West Hollywood*,
   No. 21-cv-01448 (C.D. Cal. Feb 17, 2021) .................................................................................7

*California Grocers Ass'n. v. City of Los Angeles*,
   52 Cal. 4th 177 (2011).................................................................................................15, 16, 21

*Calop Bus. Sys., Inc. v. City of Los Angeles*,
   984 F. Supp. 2d 981 (C.D. Cal. 2013) .......................................................................................15

*Campanelli v. Allstate Life Ins. Co.*,
   322 F.3d 1086 (9th Cir. 2003)...................................................................................................22

*Campbell v. Jilik*, No. 09-cv-1305,
   2010 WL 2605239 (W.D. Wash. June 25, 2010) .......................................................................10

*Cetacean Cmty. v. Bush*,
   386 F.3d 1169 (9th Cir. 2004) .....................................................................................................9

*Chicago Bd. of Realtors, Inc. v. City of Chicago*,

819 F.2d 732 (7th Cir. 1987) .................................................................................25

*Ctr. for Biological Diversity v. Bernhardt*,
   No. 19-cv-05206, 2020 WL 4188091 (N.D. Cal. May 18, 2020) ..........................2, 10

*Energy Reserves Group, Inc. v. Kan. Power & Light Co.*,
   459 U.S. 400 (1983)............................................................................................ passim

*Exxon Corp. v. Eagerton*,
   462 U.S. 176 (1983)..................................................................................................22

*Fifth Third Bancorp v. Dudenhoeffer*,
   573 U.S. 409 (2014)....................................................................................................9

*Fort Halifax Packing Co. v. Coyne*,
   482 U.S. 1 (1987)................................................................................................ passim

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
   528 U.S. 167 (2000)..................................................................................................10

*Fund Democracy, LLC v. Sec. & Exchange Comm'n*,
   278 F.3d 21 (D.C. Cir. 2002).....................................................................................11

*Gen. Motors Corp. v. Romein*,
   503 U.S. 181 (1992)............................................................................................22, 23

*Godecke v. Kinetic Concepts, Inc.*,
   937 F.3d 1201 (9th Cir. 2019).....................................................................................8

*Golden State Transit Corp. v. City of Los Angeles*,
   475 U.S. 608 (1986)............................................................................................11, 12

*Home Bldg. & Loan Ass'n v. Blaisdell*,
   290 U.S. 398 (1934)............................................................................................19, 24

*Hudson Water Co. v. McCarter*,
   209 U.S. 349 (1908)..................................................................................................23

*Interpipe Contracting, Inc. v. Becerra*,
   898 F.3d 879 (9th Cir. 2018).................................................................11, 12, 14, 16

*Iqbal v. Ashcroft*,
   556 U.S. 662 (2009)..................................................................................................23

*Knappenberger v. City of Phoenix*,
   566 F.3d 936 (9th Cir. 2009).......................................................................................9

*La Cuna de Aztlan Sacred Sites Protection Circle Advisory Comm. v. U.S. Dep't of Interior*,
   No. EDCV 11-1478- GW(SSX), 2012 WL 13054950 (C.D. Cal. Feb. 9, 2012) .....................11

*Lee v. City of Los Angeles*,
   250 F.3d 668 (9th Cir. 2001) ......................................................................................8

*Lehnhausen v. Lake Shore Auto Parts Co.*,
   410 U.S. 356 (1973)..................................................................................................20

*Leite v. Crane Co.*,
   749 F.3d 1117 (9th Cir. 2014) ....................................................................................8

*Lopez v. Smith*,
   203 F.3d 1122 (9th Cir. 2000) ....................................................................................9

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992)..................................................................................................10

*Mack v. South Bay Beer Distrib.*,

iv

798 F.2d 1279 (9th Cir.1986) ...................................................................8

*Metro. Life Ins. Co. v. Massachusetts*,
  471 U.S. 724 (1985).................................................................12, 13, 17

*Nat. Broad. Co. v. Bradshaw*,
  70 F.3d 69 (9th Cir. 1995) ......................................................................18

*Northwest Grocers Ass'n v. City of Burien*,
  No. 21-cv-00203 (W.D. Wash. Feb. 17, 2021)......................................7

*Northwest Grocers Ass'n v. City of Seattle*,
  No. 21-cv-00142 (W.D. Wash. Feb. 03, 2021)......................................7

*Plyler v. Doe*,
  457 U.S. 202 (1982).......................................................................19, 21

*Rondout Elec., Inc. v. NYS Dept. of Labor*,
  335 F.3d 162, 169 (2d Cir.2003) ...........................................................15

*RUI One Corp. v. City of Berkeley*,
  371 F.3d 1137 (9th Cir. 2004) ..........................................18, 19, 21, 22

*Safe Air for Everyone v. Meyer*,
  373 F.3d 1035 (9th Cir. 2004) .................................................................8

*St. Thomas-St. John Hotel & Tourism Ass'n, Inc. v. Gov't of U.S. Virgin Islands*,
  218 F.3d 232 (3d Cir. 2000) ...................................................................15

*Steel Co. v. Citizens for a Better Environment*,
  523 U.S. 83 (1998)....................................................................................9

*Taggart v. Weinacker's, Inc*.,
  397 U.S. 223 (1970)................................................................................17

*Teamsters v. Morton*,
  377 U.S. 252 (1964)................................................................................12

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)..................................................................................8

*Tigner v. Texas*,
  310 U.S. 141 (1940)................................................................................21

*Tucson Woman's Clinic v. Eden*,
  379 F.3d 531 (9th Cir. 2004) ..................................................................19

*United States Trust Co. of New York v. New Jersey*,
  431 U.S. 1 (1977)........................................................................22, 23, 24

*United States v. Williams*,
  124 F.3d 411 (3rd Cir. 1997) ..................................................................20

*Veix v. Sixth Ward Building & Loan Ass'n of Newark*,
  310 U.S. 32 (1940)..................................................................................24

*Viceroy Gold Corp. v. Aubry*,
  75 F.3d 482 (9th Cir.1996) ...............................................................16, 18

*W. Watersheds Project v. Kraayenbrink*,
  632 F.3d 472 (9th Cir. 2011) ..................................................................10

*West Coast Hotel Co. v. Parrish*,
  300 U.S. 379 (1937)..........................................................................18, 19

*Williamson v. Lee Optical of Oklahoma Inc*.,

348 U.S. 483 (1955)........................................................................................20, 21

**Statutes**

Cal. Labor Code § 1171 *et seq.*............................................................................23

Cal. Labor Code § 246...........................................................................................23

Cal. Labor Code § 3200 *et seq.*............................................................................23

Cal. Labor Code § 6300 *et seq.*............................................................................23

Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*.............................................23

O.M.C. § 5.92.020.................................................................................................23

O.M.C. § 5.92.030.................................................................................................23

**Constitutional Provisions**

CAL. CONST. art. 1, § 7.........................................................................................19

CAL. CONST. art. 1, § 9.........................................................................................21

U.S. CONST. amend. XIV § 1................................................................................19

U.S. CONST. art. 1, § 10.......................................................................................21

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.    INTRODUCTION

One year ago, amidst the hazards and uncertainty surrounding COVID-19, six Bay Area counties issued Shelter-in-Place orders. Within days, nearly seven million residents ceased commuting to work, filing into classrooms, socializing in person with friends and loved ones, and going to gyms, movie theaters, concert venues, and restaurants. The vast majority of people thus limited their exposure to the novel coronavirus. But not grocery workers.

Grocery employees serve as essential workers at heightened risk to their health. They staff indoor retail spaces where there is less air circulation. They interact with a large number of customers, who file in and out of grocery stores on a minute-to-minute basis all day long. And grocery workers with dependent children must grapple with the challenge of looking after their children while schools are closed. As a consequence of their essential service, more than 700 grocery workers in Northern California have tested positive with COVID-19.

For their efforts, grocery workers have been recognized nominally as heroes and monetarily with one-off bonuses, sometimes called "hero pay" or "hazard pay." Grocery stores could afford these bonuses and more. During the same period, and due to the pandemic, grocery stores have made record profits. One major grocery chain that operates in Oakland, Albertsons, enjoyed a 149 percent increase in profits compared to the previous year. And Albertsons, reflecting the general tendency of grocers during this time, used this profit to spend more than five times as much on stock buybacks as it did on hero pay and sick pay for its workers.

To support grocery workers in large stores that can afford additional hazard pay, the City of Oakland (the "City") enacted emergency Ordinance No. 13639 C.M.S. (the "Ordinance") on February 2, 2021. The Ordinance requires large grocery stores to temporarily pay an additional five dollars an hour to its employees. This requirement is reduced for employers who voluntarily provide their employees with COVID-19-related hazard pay. The Ordinance is tethered to the severity of the pandemic so when the level of community transmission in the City returns to the yellow tier (minimal risk) under State of California Health Orders, the requirement for temporary hazard pay does not apply. For unionized grocery stores, workers and employers who wish to

City of Oakland's Motion to Dismiss                                                                    3:21-cv-00863-WHO

renegotiate the hazard pay requirement may waive some or all of the provisions of the Ordinance through a bona fide collective bargaining agreement.

California Grocers Association ("CGA" or "Plaintiff") filed the instant complaint for declaratory and injunctive relief one day after the Ordinance was enacted, seeking to enjoin the enforcement of the Ordinance and invalidate its provisions based on three theories: National Labor Relations Act ("NLRA") preemption under the *Machinists* doctrine; violation of the Equal Protection Clause of the United States and California constitutions; and violation of the Contracts Clause of the United States and California constitutions. These claims fail as a matter of law.

As a preliminary matter, CGA lacks standing to bring these challenges because it fails to identify a single Oakland grocery store member that has suffered or would suffer harm as a result of the Ordinance. *See, e.g., Ctr. for Biological Diversity v. Bernhardt*, No. 19-cv-05206, 2020 WL 4188091, *3 (N.D. Cal. May 18, 2020) (granting 12(b)(1) motion where plaintiff did not "show that at least one identified member [has] suffered or would suffer harm").

Even if it had standing, CGA's claims fail for multiple independent reasons. First, CGA's theory of preemption under *Machinists* has been rejected many times over by the United States Supreme Court and the Ninth Circuit. The NLRA is concerned with the process of collective bargaining; it does not preempt substantive labor standards such as those set forth by the Ordinance. CGA's Equal Protection Clause challenges similarly fail. There is no fundamental right to contract that would trigger strict scrutiny of the Ordinance. The Ordinance is an economic regulation and rational basis review applies. The Ordinance easily survives such review. Finally, CGA's Contracts Clause claims fail at each phase of the analysis. Among other issues, CGA fails to identify a single contract, or a single contract term that the Ordinance supposedly impairs. Moreover, a local wage mandate such as that set forth in the Ordinance, does not "substantially impair" an employment contract. If such a theory was valid, no minimum wage law, worker's compensation law, or a host of other similar minimum labor standards could be imposed on employers. And even if CGA could establish a unique showing of substantial impairment in this case, the deferential standard of review applicable to such economic regulations that impact only private contracts is easily met: The Ordinance has a significant and legitimate public purpose. In

2

all events, CGA fails to state a claim upon which relief can be granted, and the Complaint should be dismissed without leave to amend.

## II.      STATEMENT OF ISSUES

Does Plaintiff lack standing to bring these challenges given that it fails to identify a single Oakland grocery store member that has suffered or would suffer harm as a result of the Ordinance? Does Plaintiff state a claim upon which relief can be granted given that: the *Machinists* preemption does not apply to minimum substantive labor standards; "freedom of contract" is not a fundamental right protected by the Equal Protection Clause and rational basis review applies; Plaintiff has failed to identify a single contract and the Contracts Clause requires a complainant to allege a substantial impairment of a contract term and, in all events, the Ordinance has a significant and legitimate public purpose?

## III.     STATEMENT OF FACTS

**A.     Grocery workers, essential to society, have been hit hard by the COVID-19 pandemic.**

On March 16, 2020 six Bay Area governments issued the region's first shelter-in-place orders. *See* Request for Judicial Notice ("RJN"), Exh. B, 2. Overnight, nearly seven million people were asked to stay home to secure themselves from the risk of exposure to the novel coronavirus. Three days later, the State of California designated segments of the economy Essential Critical Infrastructure, and its employees, "essential workers." *Id.* The purpose of the designation was to maintain the "continuity of functions critical to public health and safety, as well as economic and national security." *Id.* Grocery workers, like other essential workers, were therefore required to leave the security of their homes and continue going to work for this greater good. By keeping grocery stores open, these workers sustained the food supply. *Id.*

Grocery workers thus went to work at the risk of their health and their family's health. Unlike the vast majority of people, they cannot work from home, and the flow of changing customers in grocery stores present a perpetual health threat throughout the workday. *See id.* (noting that "20% of grocery workers were at risk of asymptomatic infection despite taking precautions but remaining unable to socially distance"). Over 700 grocery workers in Northern

California have tested positive for COVID-19. RJN, Exh. A, 2. Nationwide, that number is 8,200, with no fewer than 130 grocery workers dying from the virus so far. *Id.* at 1. The risk of infection is difficult to mitigate, even with health and safety precautions, and as a result there have been highly publicized outbreaks among grocery workers in Oakland. *Id.* at 1–2.

That grocery workers are paid little adds to their precarious status. They are "among the lowest wage earners" in the United States. RJN, Exh. B, 5. With their low income, the cost of housing and increased childcare costs (as a result of school closures) pose a serious threat to the stability of workers and their families. *See* RJN, Exhs. A, 3 & B, 2. If a grocery worker is forced to leave their job because of the low wage and/or increased costs, the grocery store employer would have to hire and train new staff in the usual job requirements and the latest COVID-19 protocols. *Id.* Maintaining well-trained and consistent staffing is important to the stability of the food supply chain; minimizing staff turnover is vital to this effort. *Id.*

Grocery workers have received some support in recognition of their essential and precarious status. The City, for example, adopted ordinances strengthening COVID-19-related protections, such as Emergency Paid Sick Leave. RJN, Exh. A, 2. Some grocery stores have offered their employees one-time bonuses, often denoted "hero pay." RJN, Exh. B, 2-3. Most employers, however, ceased providing these bonuses at the end of Summer 2020. *Id.* at 3. Since that time, virus infection risk has not decreased. *Id.* Instead, the holiday period at the end of 2020 and beginning of 2021 countenanced a sharp rise in COVID-19 infections. *See* RJN, Exh. A, 2–3; Exh. B, 3 (noting that "the risk of COVID-19 infection is at its worst level ever, both in Oakland and throughout the U.S."). Reflecting the continued severity of the pandemic, Intensive Care Unit (ICU) capacity in the Bay Area was below 15 percent when the Ordinance was enacted. RJN, Exh. A, 2. In Oakland, ICUs were at "maximum capacity." RJN, Exh. A, 3.

Grocery stores, meanwhile, have posted record profits during the pandemic. Albertsons, a large grocery store which has locations in Oakland, saw their profits increase by 149 percent in the first three quarters of 2020 compared to 2019—the largest profit growth observed in an analysis of the 13 largest retail and grocery companies that posted record profits during this time. *See* RJN, Exh. C, 2. Whole Foods, which also operates in Oakland, is owned by Amazon, whose stock price

1  has increased by 70 percent since the onset of the pandemic. *Id*. To compare, the hero pay afforded

2  by Walmart, Kroger, and Albertsons provided an average premium of $0.76 per hour to their

3  workers through the end of 2020. *Id*. at 7. These three companies generated an additional $6.8

4  billion in the first three quarters of 2020 as compared to that period during 2019. *Id*. Albertsons,

5  reflecting the general tendency of grocers during this time, spent more than five times as much on

6  stock buybacks as it did on hero pay and sick pay for its workers. *See id*. at 5-7.

7  **B.     The City adopts an emergency ordinance to support grocery workers.**

8          The City Council enacted Ordinance No. 13639 C.M.S. on February 2, 2021. RJN, Exh.

9  A, 1. The Ordinance is an emergency law passed pursuant to the City's general police powers and

10  Section 213 of the Oakland City Charter. *Id.* at 3. In support of invoking its emergency authority,

11  the City Council enumerated several urgent conditions, including: the COVID-19 pandemic; the

12  "critically low availability [of] Intensive Care Unit ("ICU") beds"; the maximum capacity of ICUs

13  in Oakland, in particular; the role of grocery stores as a "critical piece of infrastructure in our fight

14  against the COVID-19 virus and in protecting the food supply chain"; the risks of grocery worker

15  turnover; workers' inability to pay for housing and childcare; and the need for "large grocery stores

16  in Oakland [to] have well-trained, consistent and stable staffing." *Id*. As an emergency law, the

17  Ordinance is temporary in nature and will remain in effect only until the level of community

18  transmission in the City returns to the yellow tier under State of California Health Orders, which

19  symbolizes minimal risk under the state's health guidance. *Id.* at 3-4.

20          The City Council found that "requiring large grocery stores with a large number of

21  employees to provide hazard pay during the pandemic will have a greater impact on the community

22  including but not limited to encouraging employees to remain employed and thereby reducing the

23  risk of food supply disruption." *Id.* at 2. The City Council also found that "large grocery stores are

24  more readily positioned than smaller grocery stores to absorb any short-term burdens the

25  ordinance's requirements might impose on employers." *Id*. The City Council also noted that

26  grocery workers are exposed to heightened risk through their labor, that many grocery workers

27  have fallen ill from COVID-19, and that the grocery stores have reaped major profits during the

28  pandemic. *Id*. 1–2.

The Ordinance has the following key components:

- The Ordinance applies to Large Grocery Stores, defined as retail or wholesale stores over 15,000 square feet in size, located within Oakland that sell primarily household foodstuffs for offsite consumption. *Id.* at § 5, 5.96.030(L). Covered Employers are those persons who own or operate a Large Grocery Store in the City of Oakland, and who employ (or are associated with a franchise that employs) 500 or more employees nationwide. *Id.* at § 5, 5.96.030(D). A Covered Employee is any individual who qualifies as an employee entitled to the California minimum wage, and who works in a Large Grocery Store either full-time or part-time. *Id.* at § 5, 5.96.030(C).

- Covered Employers must compensate Covered Employees an additional five dollars per hour in hazard pay for the hardships and/or risks associated with working during the COVID-19 pandemic. *Id.* at §2 & § 5, 5.96.040(A), 5.96.030(I).

- If a Covered Employer initiates hero pay or hazard pay during the effective period of the Ordinance, the City credits that amount against the employer's hazard pay obligation. *Id.* at § 5, 5.96.050, 5.96.040(B), 5.96.030(E).

- Any provision of the Ordinance may be waived through a bona fide collective bargaining agreement with the Covered Employer. *Id.* at § 5, 5.96.060.

- Covered Employers are prohibited from retaliating against an employee or former employee for exercising their rights under the Ordinance. *Id.* at § 5, 5.96.070.

- The hazard pay requirement applies only until such time as the risk level under State Health Orders returns to the yellow (minimal risk) tier. *Id.* at §§4-5, 5.96.040(C).

## C.    CGA sues the City and several other localities.

On February 3, 2021, the day after the City enacted the Ordinance, CGA filed the instant complaint. *See* Compl. Plaintiff alleges that the Ordinance causes their member grocery stores "to suffer economic and non-economic harm." Compl. ¶ 14. Specifically, Plaintiff complains that the Ordinance forces its members "to alter the wage scales and other terms of their existing collective bargaining agreements, regardless of any additional hero pay, bonuses, or other non-monetary compensation provided to employees to ease the burden of the COVID-19 pandemic." *Id.* In addition, Plaintiff alleges that the Ordinance "singles out large grocery companies . . . without providing any reasonable justification for the exclusion of other employers or frontline retail workers." *Id.* ¶ 15. Plaintiff also contends that there "is no support for any of the City's statements that the Premium Pay will protect public health, address economic insecurity and promote job retention." *Id.*

Plaintiff brings five claims against the City. Plaintiff alleges that the Ordinance is (1)

preempted by the National Labor Relations Act ("NLRA"); (2) violates the Equal Protection Clause of the United States Constitution; (3) violates the Equal Protection Clause of the California Constitution; (4) violates the Contracts Clause of the United States Constitution; and (5) violates the Contracts Clause of the California Constitution. Compl. ¶¶ 20–45. As of March 26, 2021, Plaintiff has filed identical claims in federal against at least six other California cities' hazard pay ordinances. *See California Grocers Ass'n v. City of Long Beach*, No. 21-cv-00524 (C.D. Cal. Jan 20, 2021); *California Grocers Ass'n v. City of Montebello*, No. 21-cv-01011 (C.D. Cal. Feb 03, 2021); *California Grocers Ass'n v. City of San Leandro*, No. 21-cv-01175 (N.D. Cal. Feb 17, 2021); *California Grocers Ass'n v. City of West Hollywood*, No. 21-cv-01448 (C.D. Cal. Feb 17, 2021); *California Grocers Ass'n v. City of San Jose*, No. 21-cv-01772 (N.D. Cal. Mar. 12, 2021); *California Grocers Ass'n v. City of Daly City*, No. 21-cv-01773 (N.D. Cal. Mar. 12, 2021);. Plaintiff's counsel has filed two virtually identical lawsuits on behalf of the Northwest Grocers Association in the state of Washington. *Northwest Grocers Ass'n v. City of Seattle*, No. 21-cv-00142 (W.D. Wash. Feb. 03, 2021); *Northwest Grocers Ass'n v. City of Burien*, No. 21-cv-00203 (W.D. Wash. Feb. 17, 2021). These challenges so far have been unavailing. *See, e.g.*, *California Grocers Ass'n v. City of Long Beach*, No. 21-cv-00524, 2021 WL 736627, at *1 (C.D. Cal. Feb. 25, 2021) (denying CGA's motion for preliminary injunction); *Northwest Grocers Ass'n v. City of Seattle*, No. 21-cv-00142, 2021 WL 1055994, at *1, 8 (W.D. Wash. March 18, 2021) (granting Seattle's motion to dismiss without leave to amend and denying plaintiff's motion for preliminary injunction as moot).

## IV.    LEGAL STANDARD

A complaint may be dismissed for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). When a defendant asserts Rule 12(b)(1) as a facial challenge to the complaint, the defendant argues "that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (contrasting a facial and factual Rule 12(b)(1) challenge). As with a Rule 12(b)(6) motion, the district court resolves a facial challenge under Rule 12(b)(1) by accepting Plaintiff's allegations as true and drawing all reasonable inferences in their favor. *Leite v. Crane Co.*, 749 F.3d 1117,

1121 (9th Cir. 2014). The court's jurisdiction may not be invoked if a plaintiff's allegations are insufficient as a legal matter. *Id*.

A complaint may also be dismissed for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). The Court, viewing all allegations in the complaint in the light most favorable to a plaintiff, must decide if a plaintiff alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). However, the Court does not accept as true "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* A court may also take judicial notice of documents in the public record. *See Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (citing *Mack v. South Bay Beer Distrib.*, 798 F.2d 1279, 1282 (9th Cir.1986)) (on a motion to dismiss, a court may take judicial notice on matters of public record); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.").

Dismissal under Rule 12(b)(6) is appropriate in two cases: first, if there is a "lack of a cognizable legal theory," or second, in "the absence of sufficient facts alleged under a cognizable legal theory." *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019) (internal quotation omitted). Although leave to amend a complaint is often appropriate, such leave is properly denied when "the pleading could not possibly be cured by the allegation of other facts." *Knappenberger v. City of Phoenix*, 566 F.3d 936, 942 (9th Cir. 2009) (quoting *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000)). A motion to dismiss for failure to state a claim is an "important mechanism for weeding out meritless claims" and dividing "the plausible sheep from the meritless goats." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).

## V.    ARGUMENT

CGA cannot state a claim for *Machinists* preemption under the NLRA because the Ordinance does not interfere with collective bargaining. Decades of settled precedent establish that the Ordinance, a minimum substantive labor standard, is a valid exercise of police power to which

*Machinists* does not apply. CGA's Equal Protection Clause claims are likewise unavailing. No fundamental right to "freedom of contract" exists such that strict scrutiny might apply, and the Ordinance easily meets the applicable rational basis standard of review. CGA's Contracts Clause claims similarly fail. First, the Complaint fails to identify a specific contractual impairment, and even if it could, that impairment would not be substantial given the history and presence of heavy regulation over California employers. Second, although the Contracts Clause requires only "a significant and legitimate purpose" in the face of a substantial impairment, the Ordinance is justified by several purposes expressly approved by the U.S. Supreme Court. And the last step of the Contracts Clause analysis, which in this case mirrors rational basis review, likewise forecloses CGA's attempt. Because CGA does not state any cognizable legal theory or set of facts upon which this court may grant relief, the Complaint should be dismissed without leave to amend.

**A.    CGA lacks standing to bring this claim because it fails to identify at least one member that has suffered or would suffer harm as a result of the Ordinance.**

The Complaint fails at the outset because CGA fails to establish standing. A lawsuit "brought by a plaintiff without Article III standing is not a 'case or controversy,' and an Article III federal court therefore lacks subject matter jurisdiction over the suit." *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004) (citing *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 10 (1998)). "[W]hen the plaintiff is not [it]self the object of the government action or inaction [it] challenges, standing is not precluded, but is ordinarily substantially more difficult to establish." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992) (quotation marks & citation omitted). An association can, however, establish standing to bring a challenge on behalf of its constituent members if: (1) "its members would otherwise have standing to sue in their own right," (2) "the interests at stake are germane to the organization's purpose," and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 482-83 (9th Cir. 2011) (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc*., 528 U.S. 167, 181 (2000)). To sufficiently plead a "concrete and particularized injury," the association "must provide 'specific allegations establishing that at least one identified member suffered or would suffer harm.'" *Kraayenbrink*,

632 F.3d at 483.

The Complaint fails to identify a specific member of CGA who has or would suffer a "concrete and particularized injury" from the Ordinance. Although CGA describes itself in the Complaint as a "nonprofit, statewide trade association" with "over 300 retailers and approximately 150 grocery supply companies" among its ranks, it does not identify a single member. Compl. ¶ 10. Likewise, although CGA alleges that some of its members "operate grocery stores in the City that employ members of a specific labor union, United Commercial Food Workers International, Local 5," it does not identify a single Oakland member. *Id*. at ¶ 13.

Identifying these individual members is a crucial predicate to conducting the Article III standing analysis. Because the CGA fails to name a single member, it necessarily fails to allege any particular collective bargaining agreement term purportedly impacted by the Ordinance. Without at least one identified member, the City is left to respond to hypothetical harms. The Court requires more to exercise its jurisdiction. *See Lujan*, 504 U.S. at 560 (holding that a sufficiently-pleaded injury in fact requires the plaintiff to demonstrate "an invasion of a legally protected interest" that is "concrete and particularized," as well as "actual or imminent," as opposed to "conjectural or hypothetical."). *See also Campbell v. Jilik*, No. 09-cv-1305, 2010 WL 2605239, *5 (W.D. Wash. June 25, 2010) ("Because the complaint fails to identify any of the group's members, the group cannot invoke this Court's jurisdiction in order to litigate the rights of injured members"); *Ctr. for Biological Diversity*, No. 19-cv-05206, 2020 WL 4188091, *3 (N.D. Cal. May 18, 2020) (granting 12(b)(1) motion where plaintiff did not "show that at least one identified member [has] suffered or would suffer harm"); *Fund Democracy, LLC v. Sec. & Exchange Comm'n*, 278 F.3d 21, 25 (D.C. Cir. 2002) (granting motion to dismiss where plaintiff association "has not shown that any of the individual mutual fund investors it claims as 'members' have standing to sue in their own right"); *La Cuna de Aztlan Sacred Sites Protection Circle Advisory Comm. v. U.S. Dep't of Interior*, No. EDCV 11-1478- GW(SSX), 2012 WL 13054950, *11 (C.D. Cal. Feb. 9, 2012) (granting motion to dismiss "[b]ecause Plaintiffs … have failed to allege sufficiently that at least one identified member has been or will be harmed").

**B.      The National Labor Relations Act does not preempt the Ordinance.**

Courts "are reluctant to infer pre-emption" when interpreting federal law, and so start "with the basic assumption that Congress did not intend to displace state law." *Bldg. & Const. Trades Council of Metro. Dist. v. Associated Builders & Contractors of Massachusetts/Rhode Island, Inc.*, 507 U.S. 218, 224 (1993). In the case of state labor standards, "pre-emption should not be lightly inferred . . . since the establishment of labor standards falls within the traditional police power of the State." *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 21 (1987).

With this context, courts recognize that the NLRA impliedly preempts two types of local action[1]: "(1) laws that regulate conduct that is either protected or prohibited by the NLRA (*Garmon* preemption), and (2) laws that regulate in an area Congress intended to leave unregulated or 'controlled by the free play of economic forces' (*Machinists* preemption)." *Interpipe Contracting, Inc. v. Becerra*, 898 F.3d 879, 887 (9th Cir. 2018) (quoting *Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO v. Wis. Employment Relations Comm'n*, 427 U.S. 132, 140 (1976)).

The CGA alleges that the ordinance is preempted under *Machinists*. Compl. ¶ 22. The Complaint thus argues that the Ordinance reflects the "state and local regulation of conduct that Congress intended to be left to be controlled by the free-play of economic forces," and that it "interferes with the 'balanced state of collective bargaining.'" Compl. ¶ 22 (citing *Machinists*). But this preemption theory is not sufficiently supported by either fact or law.

1. ***Machinists* preempts state laws that regulate the collective bargaining process; it does not preempt laws that merely set substantive employment standards.**

The nub of *Machinists* analysis is about whether the state action "interferes with the collective bargaining process." *Interpipe Contracting*, 898 F.3d at 888 (citing *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 756 (1985)). This is because "[t]he NLRA is concerned primarily with establishing an equitable process for determining terms and conditions of employment, and not with particular substantive terms of the bargain that is struck when the parties are negotiating from relatively equal positions." *Metro. Life*, 471 U.S. at 753.

States are thus "prohibited from imposing additional restrictions on economic weapons of

---

[1] The "pre-emption analysis is not affected by the fact that [the court is] reviewing a city's actions rather than those of a State." *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 614 n.5(1986).

self-help, such as strikes or lockouts." *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 614–15 (1986); *Machinists*, 427 U.S. at 147–48 ("[T]he crucial inquiry regarding pre-emption is the same: whether 'the exercise of plenary state authority to curtail or entirely prohibit self-help would frustrate effective implementation of the Act's processes.'") (citations omitted). "Congress left these self-help tools unregulated to allow tactical bargaining decisions 'to be controlled by the free play of economic forces.'" *Am. Hotel & Lodging Ass'n v. City of Los Angeles*, 834 F.3d 958, 963 (9th Cir. 2016) (quoting *Machinists*, 427 U.S. at 140). Under this doctrine, courts have therefore preempted: a state cease and desist order against union workers refusing to work overtime during labor negotiations, 427 U.S. at 155; a city from conditioning a franchise renewal on settlement of a labor dispute, 475 U.S. at 619; and a state law that prohibited unions from deploying secondary boycotts during labor disputes, *Teamsters v. Morton*, 377 U.S. 252, 260 (1964).

By contrast, state laws that merely establish substantive employment standards are not preempted under *Machinists* because they do not interfere with the collective bargaining process. For example, in *Metropolitan Life Insurance Company v. Massachusetts*, a state law set forth mandatory minimum mental health care benefits for state residents insured under certain insurance plans and employee healthcare plans. *Metro. Life*, 471 U.S. at 748. Insurers argued NLRA preemption because the law effectively "mandated terms of collective bargaining agreements" in that it required the benefit plans "to purchase certain benefits the parties may not have wished to purchase." *Id.* The Supreme Court rejected this argument, observing that "there is no suggestion in the legislative history of the Act that Congress intended to disturb the myriad state laws then in existence that set minimum labor standards, but were unrelated in any way to the processes of bargaining or self-organization" and that "[s]tates possess broad authority under their police powers to regulate the employment relationship to protect workers within the State." *Id.* at 756. Finding no preemption, the Supreme Court concluded:

> Thus, in *Malone v. White Motor Corp.*, *supra,* the Court rejected a similar challenge to a pre-ERISA state pension Act which established minimum funding and vesting levels for employee pension plans. The Court found the law not pre-empted by the NLRA, in part for reasons relevant here:
>
> "There is little doubt that under the federal statutes governing labor-management

relations, an employer must bargain about wages, hours, and working conditions and that pension benefits are proper subjects of compulsory bargaining. But there is nothing in the NLRA ... which expressly forecloses all state regulatory power with respect to those issues, such as pension plans, that may be the subject of collective bargaining." (citation)

Massachusetts' mandated-benefit law is an insurance regulation designed to implement the Commonwealth's policy on mental-health care, and as such is a valid and unexceptional exercise of the Commonwealth's police power. It was designed in part to ensure that the less wealthy residents of the Commonwealth would be provided adequate mental-health treatment should they require it. Though § 47B, like many laws affecting terms of employment, potentially limits an employee's right to choose one thing by requiring that he be provided with something else, it does not limit the rights of self-organization or collective bargaining protected by the NLRA, and is not pre-empted by that Act.

*Metro. Life*, 471 U.S. at 758 (citing *Malone,* 435 U.S. 497, 504-05 (1978)).

Likewise, in *Fort Halifax Packing Company v. Coyne*, the Supreme Court held that a Maine law requiring companies to pay their workers severance when they closed large plants was not preempted. As CGA does here, the employer argued "that the Maine law intrudes on the bargaining activities of the parties because the prospect of a statutory obligation undercuts the employer's ability to withstand a union's demand for severance pay." *Fort Halifax*, 482 U.S. at 20. The Supreme Court disagreed: "This argument—that a State's establishment of minimum labor standards undercuts collective bargaining—was considered in and rejected in *Metropolitan Life Ins. Co. v. Massachusetts*[.]" *Id.* The Supreme Court observed:

It is true that the Maine statute gives employees something for which they otherwise might have to bargain. That is true, however, with regard to any state law that substantively regulates employment conditions. Both employers and employees come to the bargaining table with rights under state law that form a "backdrop" for their negotiations.

*Id.* at 21. The fact "that a state statute pertains to matters over which the parties are free to bargain cannot support a claim of pre-emption[.]" *Id.*

In accord, the Ninth Circuit has observed that "[v]irtually any labor standard—e.g., wage and hour requirements—will affect the terms of a [collective bargaining agreement] . . . [b]ut such *effects* differ in kind from a State's regulation of the bargaining process itself." *Interpipe Contracting*, 898 F.3d at 888 (emphasis in original). While "state action that intrudes on the

13

mechanics of collective bargaining is preempted . . . state action that sets the stage for such bargaining is not." *Am. Hotel & Lodging Ass'n.* 834 F.3d at 964; *Fort Halifax*, 482 U.S. at 21 ("Both employers and employees come to the bargaining table with rights under state law that form a 'backdrop' for their negotiations."). The *Machinists* preemption does not apply to substantive labor standards and preempts only state laws that interfere with the collective bargaining process.

> ### 2. To the extent CGA relies on *Chamber of Com. of U.S. v. Bragdon*, 64 F.3d 497 (9th Cir. 1995) it is factually distinguishable and has been effectively repudiated by the Ninth Circuit.

CGA may attempt to argue for *Machinists* preemption under the *Chamber of Com. of U.S. v. Bragdon*, 64 F.3d 497 (9th Cir. 1995), but that case is inapposite to the Ordinance. The ordinance in *Bragdon* required contractors on private construction projects to provide prevailing wages based on wages set by public works projects, which in turn were based on collective-bargaining agreements. *Id.* at 502. The Ninth Circuit found the ordinance to be preempted because it presented an extreme law "so restrictive as to virtually dictate the results" of collective bargaining. 64 F.3d at 501. The unique evil identified in *Bragdon* was a Frankenstein policy design, which grafted the "prevailing wage concept utilized for public works projects" onto "minimum wage and benefit package for private construction projects." *Id.* at 501–02. Thus, what made the preempted ordinance so extreme was that its wage was "not a fixed statutory or regulatory minimum wage, but one derived from the combined collective bargaining of third parties in a particular locality." *Id.* at 502; *see Calop Bus. Sys., Inc. v. City of Los Angeles*, 984 F. Supp. 2d 981, 1011 (C.D. Cal. 2013), *aff'd in part, appeal dismissed in part*, 614 F. App'x 867 (9th Cir. 2015) (describing the ordinance as a "Hobson's choice—they had either to accept the results of third parties' collective bargaining processes or enter into a collective bargaining agreement themselves.") The Ordinance bears no resemblance to the restrictive law struck down in *Bragdon*.

As a practical matter, numerous appellate courts have since cast doubt on the application of *Bragdon* to additional cases. The Ninth Circuit declared that "*Bragdon* must be interpreted in the context of Supreme Court authority and our other, more recent, rulings on NLRA preemption." *Associated Builders & Contractors of S. California, Inc. v. Nunn*, 356 F.3d 979, 990 (9th Cir.

2004), *amended,* No. 02-56735, 2004 WL 292128 (9th Cir. Feb. 17, 2004). The California Supreme Court observed that "the Ninth Circuit Court of Appeals has effectively repudiated *Bragdon*" *California Grocers Ass'n. v. City of Los Angeles*, 52 Cal. 4th 177, 200 n.8 (2011) (citing *Nunn*, 356 F.3d at 990). The Second Circuit and Third Circuit have likewise declined the invitation to extend *Bragdon* beyond its own facts. *See Rondout Elec., Inc. v. NYS Dept. of Labor*, 335 F.3d 162, 169 (2d Cir.2003); *St. Thomas-St. John Hotel & Tourism Ass'n, Inc. v. Gov't of U.S. Virgin Islands*, 218 F.3d 232, 244 (3d Cir. 2000). *Bragdon* provides no refuge for CGA.

### 3. The Ordinance is a substantive labor standard; it does not interfere with the collective bargaining process, and it contains an opt-out provision for collective bargaining.

As set forth above, CGA's *Machinist* preemption theory—that the Ordinance "undermines the collective bargaining process" by setting a wage that a union "could not otherwise have obtained from the employer" (Compl. ¶ 24), has been expressly rejected by the Supreme Court and the Ninth Circuit. Just like minimum wage laws, overtime pay, severance pay and rest breaks, the Ordinance is a substantive minimum labor standard that merely sets the stage for bargaining. The five-dollar wage premium may well *affect* the bargaining position of the employers and employees, but it does not impinge on the collective bargaining process itself. Moreover, the Ordinance contains an opt-out provision: the entire Ordinance, "or any part thereof, may be waived in a bona fide collective bargaining agreement." RJN, Exh. A, § 5.96.060. The Ordinance does not interfere with the collective bargaining process because it allows parties to a collective bargaining agreement (i.e. the employer and the union) to completely opt out of the Ordinance entirely. The only condition for such a waiver is that it "is explicitly set forth in such agreement in clear and unambiguous terms." *Id.*

Opt-out provisions are viewed favorably by courts conducting *Machinists* analysis. "Opt-out provisions limited to unions are consistent with Congress' objectives under the NLRA because the risk of coercion is low where bargaining power between employers and employees is in equipoise." *Interpipe Contracting*, 898 F.3d at 889. The Ninth Circuit, for its part, has repeatedly approved of such opt-out provisions: there is "a flotilla of cases upholding generally applicable labor laws that include opt-out provisions limited to [collective bargaining agreements]." *Id.*

15

1    (collecting cases).

2        The severance pay provision at issue in *Fort Halifax* contained a similar opt-out clause

3    such that the severance pay provision applied "only in the absence of an agreement between

4    employer and employee." 482 U.S. at 22. In reviewing the provision to determine whether it was

5    preempted, the Supreme Court recognized that the opportunity for collective bargaining to

6    supplant the terms of the provision "strengthens the case that the statute works no intrusion on

7    collective bargaining." *Id*. Indeed, "[i]f a statute that permits no collective bargaining on a subject

8    escapes NLRA pre-emption, see *Metropolitan Life*, surely one that permits such bargaining cannot

9    be pre-empted." *Id. See also, Viceroy Gold Corp. v. Aubry*, 75 F.3d 482, 490–491 (9th Cir.1996)

10   (upholding labor protections subject to a collective bargaining opt-out provision because the

11   Legislature rationally could have believed that workers covered by collective bargaining

12   agreements have greater power to ensure safe working conditions than workers with individual

13   employment agreements). "The United States Supreme Court has made clear that affording

14   employers and unions the right to opt out and negotiate their own terms increases the likelihood a

15   given regulation will be found not preempted by the NLRA." *California Grocers Ass'n. v. City of*

16   *Los Angeles*, 52 Cal. 4th 177, 211 (2011). So too, here, the opt-out provision for collective

17   bargaining agreements is further evidence that the Ordinance does not interfere with the collective

18   bargaining process.

19       CGA's unsupported allegation that grocery stores "are required to alter the wage scales and

20   other terms of their existing collective bargaining agreements, regardless of any additional hero

21   pay, bonuses, or other non-monetary compensation provided to their employees to ease the burden

22   of the COVID-19 pandemic" (Comp. ¶ 14) does not change this result. First, as set forth above, no

23   collective bargaining agreement is necessarily altered because the parties can opt out of the

24   Ordinance entirely. Second, wage obligations are not altered *without regard* for additional hero

25   pay—the Ordinance explicitly credits employers if they so choose to offer additional hazard pay.

26   RJN, Exh. A, § 5.96.050.

27       CGA's allegation that the Ordinance is not a minimum labor standard because it "is a

28   mandatory hourly bonus for a specific group of workers, regardless of the wage negotiated in the

16

current collective bargaining agreements or other employment agreements," similarly fails to support its claims. That a state-created benefit is directed to a specific industry does not make it any less a minimum labor protection and courts have repeatedly upheld such laws in response to *Machinists* preemption claims. "[T]he NLRA does not authorize [courts] to pre-empt minimum labor standards simply because they are applicable only to particular workers in a particular industry." *Nunn*, 356 F.3d at 990 (collecting cases); *Fort Halifax*, 482 U.S. at 5 (upholding state law that applied only to industrial or commercial facilities that employ 100 or more persons); *Am. Hotel & Lodging Ass'n*, 834 F.3d at 961 (upholding local wage law applying only to hotels of certain sizes and locations).

### 4. The Ordinance is the kind of legislation courts have found to be a valid exercise of police power permissible by the NLRA.

The U.S. Supreme Court "found no suggestion in the legislative history of the [NLRA] that Congress intended to disturb the myriad state laws then in existence that set minimum labor standards, but were unrelated in any way to the processes of bargaining or self-organization." *Metro. Life*, 471 U.S. at 756. Instead, the NLRA was developed "within the larger body of state law promoting public health and safety." *Id*. at 756. Indeed, the NLRA *depends* on the exercise of local police power: "A holding that the States were precluded from acting would remove the backdrop of state law that provided the basis of congressional action . . . and would thereby artificially *create* a no-law area." *Id*. at 757 (quoting *Taggart v. Weinacker's, Inc*., 397 U.S. 223, 228 (1970)).

Recognizing the "great latitude under their police powers to legislate," the Court enumerated several legislative categories emblematic of the "broad authority" that is left undisturbed by the NLRA: "[c]hild labor laws, minimum and other wage laws, laws affecting occupational health and safety, . . . [s]tate laws requiring that employers contribute to unemployment and workmen's compensation funds, laws prescribing mandatory state holidays, and those dictating payment to employees for time spent at the polls or on jury duty." *Id*. at 756. Heeding the guidance of the Supreme Court, the Ninth Circuit has upheld against *Machinists* challenges a series of substantive labor standards that merely exercise the police power. *See, e.g.*, *Am. Hotel & Lodging Ass'n*, 834 F.3d at 963–65 (upholding local law requiring higher minimum wages and compensated time off for

employees of large hotels); *Nunn*, 356 F.3d at 990 (upholding minimum wages and benefits for state-registered apprentices); *Viceroy*, 75 F.3d at 489–90 (upholding overtime regulation that applied only to miners); *Nat. Broad. Co. v. Bradshaw*, 70 F.3d 69, 71–73 (9th Cir. 1995) (upholding state overtime protection for the broadcast industry).

"The power to regulate wages and employment conditions lies clearly within a state's or a municipality's police power." *RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1150 (9th Cir. 2004); *Alaska Airlines Inc. v. Schurke*, 898 F.3d 904, 919 (9th Cir. 2018), *cert. denied*, 130 S.Ct. 1445 (2019) ("Setting minimum wages, regulating work hours and pay periods, requiring paid and unpaid leave, protecting worker safety, prohibiting discrimination in employment, and establishing other worker rights remains well within the traditional police power of the states"); *West Coast Hotel Co. v. Parrish*, 300 U.S. 379, 393 (1937). As an exercise of the police power, the Ordinance is intended to protect the food system by reducing employee turnover during an emergency, support a sector of workers whose health and safety are severely impacted by that emergency, and is targeted to grocery stores whose size render them "more readily positioned . . . to absorb any short-term burdens" of hazard pay obligations. RJN, Exh. A, 2. The Ordinance is an appropriate exercise of police power that is permissible under the NLRA.

With little to show in the way of how the Ordinance interferes with the collective bargaining process, the CGA has in effect presented the court with a number of rejected legal theories to support their *Machinists* claim. This claim should be dismissed.

**C.      The Ordinance does not violate the U.S. or California Equal Protection Clauses.**

CGA alleges that the Ordinance violates its rights under the Equal Protection Clause. Compl. ¶ 32 (alleging that the Ordinance "improperly singles out certain grocery store business in Oakland for disparate treatment while not requiring the same treatment of similarly situated businesses"); U.S. CONST. amend. XIV § 1; CAL. CONST. art. 1, § 7. But CGA does not present a cognizable legal theory.

The equal protection analyses under the California and federal constitutions are "substantially similar." *RUI One Corp*, 371 F.3d at1154. The Equal Protection Clause requires that

"all persons similarly circumstanced shall be treated alike." *Plyler v. Doe*, 457 U.S. 202, 216 (1982). When evaluating a law challenged under the Equal Protection Clause, courts must determine the right level of scrutiny. *See Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 543 (9th Cir. 2004). Strict scrutiny is used to evaluate laws that "discriminate against a suspect class, such as a racial group, or when they discriminate based on any classification but impact a fundamental right, such as the right to vote." *Id.* (citations omitted). Intermediate scrutiny applies to laws that "discriminate based on certain other suspect classifications, such as gender." *Id.* And "[a]ll other laws are subject to rational basis review." *Id.* (citation omitted).

### 1. Freedom of contract is not a fundamental right for purpose of equal protection analysis and rational basis review applies to the Ordinance.

CGA alleges that the Ordinance "implicates the Members' fundamental right to be free from unreasonable governmental interference with their contracts, specifically their collective bargaining agreements and other employment agreements." Compl. ¶ 32. But "[t]he Constitution does not speak of freedom of contract." *Parrish*, 300 U.S. at 391 (upholding a minimum wage law). Moreover, it is well-established that the Contracts Clause is merely "facially absolute," and that "its prohibition must be accommodated to the inherent police power of the State." *Energy Reserves Group, Inc. v. Kan. Power & Light Co*., 459 U.S. 400, 410 (1983) (citing *Home Bldg. & Loan Ass'n v. Blaisdell,* 290 U.S. 398, 434 (1934)). "The power to regulate wages and employment conditions lies clearly within a state's or a municipality's police power." *RUI One Corp.*, 371 F.3d at 1150. Accordingly, such a right is not deemed fundamental for the purpose of equal protection analysis. *See United States v. Williams*, 124 F.3d 411, 422 (3rd Cir. 1997) (holding that strict scrutiny in equal protection context was not "justified on the ground that [the challenged] provision affects the defendants' right to enter into contracts"); *see also Williamson v. Lee Optical of Oklahoma Inc*., 348 U.S. 483, 489 (1955) (applying rational basis review to an equal protection challenge against a law that prohibited certain opticians from entering into particular contracts); *RUI One Corp.*, 371 F.3d at 1154 (applying rational basis review to employers' equal protection challenge to living wage ordinance). Rational basis review thus applies to CGA's Equal Protection claims.

19

### 2. The Ordinance easily satisfies rational basis review.

Laws evaluated under rational basis review are afforded "a strong presumption of validity." *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314 (1993). When analyzing "social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* at 313. In turn, those who challenge the rational basis of a statutory classification must "negative every conceivable basis which might support it." *Id.* at 315 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)).

The Ordinance makes valid statutory distinctions between large and small establishments, as well as between grocery stores and the broader retail landscape. CGA alleges that the Ordinance makes these distinctions "without providing any reasonable justification" and that any "stated purpose of the Ordinance . . . is not rationally related to discriminatory treatment." Compl. ¶¶ 32-33. But CGA relies on a prior draft of the Ordinance. *Compare* Compl. Exh. A, 2 *with* RJN, Exh. A, 2. To the contrary, the City Council expressly found that targeting "large grocery stores with a larger number of employees to provide hazard pay during the pandemic will have a greater impact on the community." RJN, Exh. A, 2. This impact includes "encouraging employees to remain employed and thereby reducing the risk of food supply disruption." *Id.* And large grocery stores "are more readily positioned than smaller grocery stores to absorb any short-term burdens the ordinance's requirements might impose on employers." *Id.*

Indeed, as the City Council findings in support of the Ordinance and multiple reports in the legislative record demonstrate, large grocery stores have made soaring profits during the pandemic. *See, e.g.*, RJN, Exh. B, 2 (noting that Albertson's, which operates in Oakland, "spent nearly $1.9 billion in stock buybacks in the first three quarters of last year, compared to the approximate $350 million, pre-tax, the company spent on hazard pay and expanded sick pay for its workers"); RJN, Exh. A, 2; Exh. B, 3; Exh. C, 2. The Ordinance plainly explains the grounds for these distinctions, and "[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." *Plyler*, 457 U.S. at 216 (quoting *Tigner*

20

1    *v. Texas*, 310 U.S. 141, 147 (1940)).

2        Although many kinds of retail establishments are per se "essential," grocery workers

3    support the food supply, a necessity the City Council decided to prioritize through the Ordinance.

4    Prioritization in this way is rational—and "virtually unreviewable," *Beach Commc'ns*., 508 U.S.

5    at 316— as "reform may take one step at a time, addressing itself to the phase of the problem

6    which seems most acute to the legislative mind. The legislature may select one phase of one field

7    and apply a remedy there, neglecting the others." *Williamson*, 348 U.S. at 489; *California Grocers*

8    *Ass'n. v. City of Los Angeles*, 52 Cal. 4th at 210 (observing that Congress and the state legislature

9    have "frequently and constitutionally" distinguished between large and small employers and that

10   the city could rationally conclude that disruptions at larger stores with larger workforces would

11   have a larger impact on the community and that larger stores would be better able to absorb any

12   short-term burdens caused by the ordinance). The Equal Protection Clause requires nothing more.[2]

13   **D.     The Ordinance does not violate the U.S. or California Contracts Clauses.**

14       CGA finally claims that the Ordinance violates its rights under the Contracts Clause. *See*

15   Compl. ¶ 40, 45; U.S. Const. art. 1, § 10, cl. 1; Cal. Const. art. 1, § 9. Here, too, Plaintiff fails

16   to state a claim upon which relief can be granted.

17       As with the equal protection analysis, "[t]he California Supreme Court uses the federal

18   Contract Clause analysis for determining whether a statute violates the parallel provision of the

19   California Constitution." *Campanelli v. Allstate Life Ins. Co*., 322 F.3d 1086, 1097 (9th Cir. 2003)

20   (citing *Calfarm Ins. Co. v. Deukmejian*, 48 Cal. 3d 805 (1989)). That analysis has three steps. "The

21   threshold inquiry is 'whether the [local] law has, in fact, operated as a substantial impairment of a

22   contractual relationship.'" *Energy Rsrvs. Grp*., 459 U.S. at 411 (quoting *Allied Structural Steel*

23   *Co. v. Spannaus*, 438 U.S. 234, 244 (1978)). If the local regulation is found to inflict a substantial

24   impairment, the city then "must have a significant and legitimate public purpose behind the

25   _____

     [2] Plaintiff also alleges that "[t]he City's stated objectives are merely an attempt to impose a
26   public policy rationale on interest-group driven legislation for labor unions and, in particular,
     UFCW 5." Compl. ¶ 33. A nearly identical allegation was made in *RUI One Corp.*, 371 F.3d at
27   1155 (noting that RUI alleged that "the City Council was instead motivated by a desire to help in
     the unionization campaign"). The Ninth Circuit did not entertain this argument, for "it is entirely
28   irrelevant for constitutional purposes whether the conceived reason for the challenged distinction
     actually motivated the legislature." *Id.* (quoting *Beach Communications*, 508 U.S. at 315).

regulation, such as the remedying of a broad and general social or economic problem." *Id*. Upon identifying a legitimate public purpose, the last step considers "whether the adjustment of 'the rights and responsibilities of contracting parties [is based] upon reasonable conditions and [is] of a character appropriate to the public purpose justifying'" the law. *Id*. at 412 (quoting *United States Trust Co. of New York v. New Jersey*, 431 U.S. 1, 22 (1977)).

### 1. The CGA fails to meet the threshold requirements of a Contracts Clause claim.

The threshold inquiry "itself has three components: 'whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial.'" *RUI One Corp*. 371 F.3d at 1147 (quoting *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992)). The first component of this inquiry "is not whether any contractual relationship whatsoever exists between the parties, but whether there was a 'contractual agreement regarding the specific . . . terms allegedly at issue.'" *Id*.

"The severity of the impairment is said to increase the level of scrutiny to which the legislation will be subjected." *Energy Rsrvs. Grp*., 459 U.S. at 411 (citing *Allied Structural Steel*, 438 U.S. at 245). "Total destruction of contractual expectations is not necessary for a finding of substantial impairment." *Id*. (citing *U.S. Trust Co*., 431 U.S. at 26–27).[3] "On the other hand, [local] regulation that restricts a party to gains it reasonably expected from a contract does not necessarily constitute a substantial impairment." *Id*. (citing *U.S. Trust Co*., 431 U.S. at 31). Reasonable contractual expectations are shaped by the regulatory context. When courts consider "the extent of the impairment," they "consider whether the industry the complaining party has entered has been regulated in the past." *Id*. "One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the State by making a contract about them." *Hudson Water Co. v. McCarter*, 209 U.S. 349, 357 (1908).

By failing to specify any impaired contractual term, the Complaint fails to state a claim at the threshold of the threshold inquiry. CGA charges the Ordinance with substantially interfering

---

[3] And destruction of contractual expectations may in any case be insufficient. "The Contract Clause does not deprive the States of their 'broad power to adopt general regulatory measures without being concerned that private contracts will be impaired, or even destroyed, as a result.'" *Exxon Corp. v. Eagerton,* 462 U.S. 176, 190 (1983).

with its "Members' contracts, including its collective bargaining agreements with its employees." Compl. ¶ 41. Though the Complaint articulates the existence of contracts, it stops short of identifying any specific contract and also fails to allege a single *specific contract term* that is impaired. Such "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal v. Ashcroft*, 556 U.S. 662, 678 (2009). The Contracts Clause analysis can end here. *Cf. Romein*, 503 U.S. at 186–87 (declining to reach the impairment analysis after finding that no specific contract term was impaired).

Were CGA able to point to a specific contract term, however, it would be unable to show its substantial impairment. This is because the substantial existing framework of employment regulation tempers CGA members' reasonable contractual expectations. *Cf. Energy Rsrvs. Grp*., 459 U.S. at 416 ("Price regulation existed and was foreseeable as the type of law that would alter contract obligations."). Prior to enactment of the Ordinance, CGA members were already subject to federal, state, and local minimum wage laws,[4] occupational safety laws,[5] paid sick leave laws,[6] collective bargaining regulation by the NLRA, and worker's compensation,[7] to name a few. Large grocery stores of the kind affected by the Ordinance, in particular, were also already subject to state worker retention regulation. *See* Cal. Labor Code § 2506. The Ordinance is therefore just the latest regulation to affect what has for some time been a "heavily regulated industry." *Energy Rsrvs. Grp.* 459 U.S. at 413. CGA members were therefore well apprised of the likelihood of "further legislation upon the same topic." *Veix v. Sixth Ward Building & Loan Ass'n of Newark*, 310 U.S. 32, 38 (1940). Indeed, if the CGA's theory were the law, an employer could obstruct minimum wage laws, mandated rest breaks, paid sick leave, and more—all in the name of impaired employment contracts. CGA has not alleged any substantial impairment of a contract.

## 2. The Ordinance is justified by a significant and legitimate purpose.

"The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests." *Energy Rsrvs. Grp*., 459 U.S. at

---

[4] *See, e.g*., Fair Labor Standards Act, 29 U.S.C. § 201 *et seq*.; Cal. Labor Code § 1171 *et seq*.; O.M.C. § 5.92.020.
[5] Cal. Labor Code § 6300 *et seq*.
[6] O.M.C. § 5.92.030; Cal. Labor Code § 246.
[7] Cal. Labor Code § 3200 *et seq*.

23

412. Indeed, "the public purpose need not be addressed to an emergency or temporary situation." *Id*. But if relevant to the enactment of the law, "[u]ndoubtedly the existence of an emergency and the limited duration of a relief measure are factors to be assessed in determining the reasonableness of an impairment." *U.S. Trust Co*., 431 U.S. at 22 n.19; *Blaisdell*, 290 U.S. at 479 (finding no impairment where the statute was appropriate to address an emergency).

The Ordinance responds to the COVID-19 emergency and it was enacted pursuant to the City's emergency authority. *See* RJN, Exh. A, 3 (citing Oakland City Charter § 213). The Ordinance's recitals set forth several emergency justifications for its passage, including the pandemic itself, the maximum capacity of ICUs, the critical role of grocery stores in securing the food supply chain, the specific socioeconomic challenges facing grocery workers, and the need for "well-trained, consistent, and stable staffing." *Id*. This is precisely the kind of legislation the Supreme Court has upheld against a Contracts Clause challenge. In *Home Bldg. & Loan Ass'n v. Blaisdell*, the Supreme Court rejected a Contracts Clause challenge against a mortgage moratorium law enacted at the height of the Great Depression, determining that the law responded to the severity of the emergency, was temporary in duration, and tied in its duration to the emergency. 290 U.S. at 444–47. The Ordinance, in addition to being justified by the pandemic, is also temporary and expressly tied in duration to an objective measurement of the severity of the pandemic: it automatically sunsets when the State of California determines that the disease risk decreases to the Yellow tier. *See* RJN, Exh. A, 3. In all events, a legitimate and substantial public purpose supports the Ordinance.

### 3. The Ordinance also sets reasonable conditions that are appropriate to the policy's purpose.

In determining whether the law adjusts "the rights and responsibilities" based upon "reasonable conditions and of a character appropriate to the public purpose" behind the law, "courts properly defer to legislative judgment as to the necessity and reasonableness of a particular measure." *Energy Rsrvs. Grp*. 459 U.S. 412–13 (framing this approach as "is customary in reviewing economic and social regulation"). Thus, when the challenged law allegedly impairs contracts between private parties, courts apply rational basis review. *See Ass'n of Surrogates & Supreme Court*

*Reporters Within City of N.Y. v. State of N.Y.*, 940 F.2d 766, 771 (2d Cir. 1991) (holding that "legislation which impairs the obligations of private contracts is tested under the contract clause by reference to a rational-basis test"); *Chicago Bd. of Realtors, Inc. v. City of Chicago*, 819 F.2d 732, 737 (7th Cir. 1987) (same).

That the Ordinance satisfies rational basis review is clear. *See* Section V.C.2, *supra*. Even beyond the low threshold of rational basis review, the Ordinance is adjusted to fit the nature of the pandemic as it has been experienced by grocery stores and their workers. In recognition of employers' inclination to award hero pay, for example, the Ordinance credits any future employer-initiated payment against its hazard pay obligations. *See* RJN, Exh. A, § 5, 5.96.050. And in light of the pandemic's uncertain duration, the Ordinance's continued operation is tethered to the State's public health guidance. *Id*. at § 4. Thus, even if the CGA's Contracts Clause claim could reach this stage of the analysis, the Complaint fails to allege sufficient facts or a cognizable legal theory to state a claim upon which relief can be granted.

## VI.    CONCLUSION

The Ordinance, temporary and targeted, seeks to support those grocery workers whose emergency labor has supported the maintenance of the local food supply during in a once in a lifetime global pandemic and even CGA recognizes its members' workers as heroes worthy of additional pay. But CGA's reluctance to share more of its members' pandemic profits with frontline workers fails to animate a single cognizable legal theory or the existence of relevant facts upon which the Court may grant relief. The Complaint should be dismissed in its entirety without leave to amend.

Dated: April 5, 2021                          BARBARA J. PARKER, City Attorney


                                              By: /s/ Selia M. Warren
                                                  Attorneys for Defendant
                                                  CITY OF OAKLAND